J-A04029-18

2018 PA Super 186

COMMONWEALTH OF
PENNSYLVANIA

   v.

MATTHEW SCOTT BECKER

       Appellant

:
:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 784 MDA 2017

Appeal from the PCRA Order April 11, 2017
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0004681-2011

BEFORE:  STABILE, J., NICHOLS, J., and RANSOM, J.[*]

OPINION BY NICHOLS, J.:                 **FILED JUNE 26, 2018**

Appellant Matthew Scott Becker appeals from the order denying his first Post Conviction Relief Act[1] (PCRA) petition seeking relief from his convictions for first-degree murder and third-degree murder of an unborn child.[2] Appellant claims that the PCRA court erred in rejecting his ineffective assistance of counsel (IAC) claims.  We affirm.

Appellant's conviction arises from the shooting death of his pregnant girlfriend, Allison Walsh (Walsh), in the evening of August 12, 2011.  Earlier that day, Appellant purchased the firearm used in the shooting, a semiautomatic .22 caliber pistol.  The shooting occurred inside the bedroom

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

[2] 18 Pa.C.S. §§ 2502(a) and 2604(c), respectively.

Appellant and Walsh were sharing in the home of Appellant's parents. Walsh, who was lying in bed, died instantly from a single .22 caliber gunshot wound to her head. Appellant's and Walsh's unborn child died later from traumatic asphyxiation.

First responders arrived and asked Appellant for the gun. Appellant ultimately retrieved it from underneath the bed. The weapon did not have a magazine inserted. However, when a first responder pulled back on the slide, an unfired cartridge came out of the handle of the pistol.

Appellant gave two statements to Pennsylvania State Police (PSP) investigators in charge of the case.[3] Appellant, shortly after the shooting, gave his first statement in the early morning hours of August 13, 2011, after waiving his **Miranda**[4] rights. Appellant asserted that he intended to clean the .22 caliber pistol, but did not know a round was chambered. According to Appellant, he loaded the pistol and began ejecting unfired cartridges from the magazine by operating the pistol's slide. He then removed the magazine from the gun and was attempting to ease the hammer down with his thumb when the weapon accidentally discharged. Appellant also indicated that at some point in the evening, Walsh began to ignore him and read her book, and that

_____

[3] The certified record in this appeal does not contain a full recording or copy of Appellant's statements. Therefore, the above summary derives from a review of the testimony presented at trial.

[4] **Miranda v. Arizona**, 384 U.S. 436 (1966).

- 2 -

he intended to "devil" her, which he clarified, meant to make her talk to him instead of reading her book.

After Appellant gave his first statement, Appellant was involuntarily committed to a mental health institution for suicidal thoughts based on statements made to the investigator. The investigation into the shooting continued while Appellant was committed. In addition to the one unfired cartridge recovered from the firearm on the night of the incident, one fired .22 caliber casing and a magazine loaded with eight rounds were found in the room in which the shooting occurred. One unfired .22 cartridge was found on an armchair in the same room. A box of .22 caliber ammunition, which was missing eleven cartridges, was near the armchair.

Investigators also received information that the safety features of the pistol should have prevented it from firing if the magazine was removed and the shooter did not have a full grip on the handle. Additionally, Appellant's former girlfriend Danielle Detweiler and her sister Devon Detweiler contacted the investigators. The Detweilers described incidents in which Appellant pointed a firearm at Danielle and shot her with a gun that shot plastic "airsoft"[5] pellets.

---

[5] The record does not conclusively establish what an "airsoft" gun is, but suggests that this type of gun fires a plastic pellet. Additionally, trial counsel elicited concessions from the Commonwealth's witnesses that "airsoft" guns were sold at toy or department stores. There was also evidence that "airsoft" guns have an orange plastic tip on the barrel.

Investigators subsequently asked Appellant to be re-interviewed, and Appellant agreed. On August 18, 2011, Appellant's father drove Appellant to the PSP barracks. Appellant was advised of his *Miranda* rights and gave a second statement. During this second interview, investigators confronted Appellant with information that the pistol's safety features should have prevented the accidental discharge. Appellant continued to assert that the weapon accidentally fired, stating it was "dumb fuck luck." N.T. Trial, 3/7/13, at 2538. However, he acknowledged that he could have placed the magazine into the weapon to release the hammer. Appellant also admitted that he and Walsh had arguments and that, in one instance, she became afraid because he either was holding a firearm or there was a firearm near him. He also acknowledged that people could be cruel when they get angry.

While Appellant was giving his second statement on August 18, 2011, Appellant's family retained Robert Bacher, Esq., to represent Appellant. Attorney Bacher attempted to see Appellant at the PSP barracks while Appellant was being interviewed. However, troopers prevented Attorney Bacher from contacting Appellant.

Appellant was charged with homicide and murder of an unborn child, and the Commonwealth sought the death penalty. Appellant retained Dennis G. Charles, Esq., and Gavin P. Holihan, Esq. was appointed as co-counsel (collectively, trial counsel).

Appellant filed an omnibus pretrial motion on May 30, 2012. Appellant sought to suppress his statements to the PSP investigators claiming that he

- 4 -

"did not knowingly, intelligently, voluntarily and/or explicitly waive his *Miranda* rights[.]" Omnibus Pretrial Mot. for Relief, 5/30/12, at 4.

The trial court held suppression hearings on August 15 and 16, 2012. The trial court entered an order denying Appellant's suppression motion on January 11, 2013. The trial court found that Appellant was not in custody during the first or second interviews and did not invoke his right to silence during the second interview. Trial Ct. Mem. Op. & Order, 1/11/13, at 3 (unpaginated).

At trial, the Commonwealth asserted that Appellant shot Walsh with the specific intent to kill her. Of relevance to this appeal, the Commonwealth elicited testimony from PSP Corporal Robert Courtright that Appellant appeared to offer his first statement voluntarily. The jury heard an audio recording of Appellant's first statement and both the Commonwealth and the defense questioned Corporal Courtright using transcriptions of Appellant's second statement.

The Commonwealth also presented the following evidence of Appellant's prior bad acts: (1) testimony from his former girlfriend Danielle Detweiler that Appellant previously pointed a firearm at her and shot her with an "airsoft" pellet gun when they dated; (2) testimony from Devon Detweiler corroborating Danielle's testimony; (3) testimony from Gregory Miller, Appellant's friend, that Appellant verbally abused and threatened Walsh with violence in 2011; and (4) a July 2011 Facebook exchange between Walsh and

her sister Megan stating that Walsh wanted to leave Appellant, but Walsh was fearful of Appellant's reaction and believed Appellant would pull a gun on her.

Appellant did not testify, but called his parents to testify about their observations on the night of the shooting. Appellant also called a PSP trooper to testify about favorable statements Appellant made during his two interviews.

During closing arguments, the Commonwealth asserted that the objective evidence belied Appellant's statements regarding the facts and circumstances surrounding the shooting and that Appellant changed his story when confronted with evidence during the second interview. According to the Commonwealth, Appellant's prior bad acts indicated that when he became angry, he would brandish firearms or shoot "airsoft" guns. N.T. Trial, 3/11/13, at 2931. The Commonwealth argued that Appellant, in his second statement, indicated that he could become cruel when he was angry. In short, the Commonwealth emphasized that Appellant, having deliberately shot Walsh in the head during a dispute, "lied" in an attempt to cover up the murder. *See* N.T. Trial, 3/11/13, at 2936-37.

On March 13, 2013, the jury found Appellant guilty of first-degree murder and murder of an unborn child. The jury deadlocked during the penalty phase, and on March 28, 2013, the trial court sentenced Appellant to life imprisonment for murder and a consecutive twenty to forty years' imprisonment for the murder of an unborn child.

Appellant took a direct appeal. This Court affirmed the judgment of sentence on March 11, 2015. *Commonwealth v. Becker*, 1801 MDA 2013 (Pa. Super. filed Mar. 11, 2015) (unpublished mem.).

In affirming Appellant's conviction, this Court adopted the trial court's opinion that Appellant voluntarily waived his *Miranda* rights at the second interview. *Id.* at 1-2; *see also* Trial Ct. Mem. Op. & Order, 1/11/13, at 3 (unpaginated). This Court also concluded that the trial court properly admitted Danielle and Devon Detweilier's prior bad acts testimony that Appellant previously brandished a firearm and shot Danielle Detweiler with an "airsoft" gun, as well as Miller's testimony regarding Appellant's relationship with Walsh. Specifically, we concluded those matters were "probative to the issue of accident and mistake and degree of guilt in this case" and rebutted Appellant's "characterization of the relationship [with Walsh] and the shooting." *Becker*, 1801 MDA 2013, at 6, 8.

However, this Court questioned the admissibility of Walsh's Facebook message to her sister under the state of mind exception to the rule against hearsay. *Id.* at 9-14. Nevertheless, we determined that the admission of the message was harmless in light of the overwhelming evidence of Appellant's guilt. *Id.* at 13-14. This Court, in particular, emphasized that there was a live round in the gun after it was fired, which refuted Appellant's contention that he believed the gun was unloaded when he attempted to ease the

hammer to a safe position. *Id.* Appellant did not seek allowance of appeal in the Pennsylvania Supreme Court.[6]

On April 6, 2016, Appellant timely filed the counseled PCRA petition giving rise to this appeal. The PCRA court held an evidentiary hearing at which both trial counsel testified. Appellant also called Attorney Bacher to testify regarding his attempt to see Appellant during Appellant's second interview with investigators on August 18, 2011.

On April 11, 2017, the PCRA court entered the order denying Appellant's PCRA petition. Appellant timely appealed and complied with the trial court's order for a Pa.R.A.P. 1925(b) statement.

Appellant presents the following questions on appeal:

1. Whether trial counsel was ineffective for failing to raise and litigate a pre-trial motion to suppress based upon an invalid ***Miranda*** waiver where counsel was denied access to [Appellant] and he was denied access to his lawyer during the police interrogation?

2. Whether trial counsel was ineffective for failing to call Attorney Bacher at both the suppression hearing and at trial?

3. Whether trial counsel was ineffective for failing to object to Cpl. Courtright's testimony when he gave an improper legal opinion that [Appellant's] confession was voluntary?

4. Whether trial counsel was ineffective for failing to request a *corpus delicti* instruction?

---

[6] We note that on direct appeal, Appellant provided a more complete record that appeared to include exhibits, as well as the recording of Appellant's first statement to investigators.

5. Whether trial counsel was ineffective for failing to request a cautionary instruction explaining the limited use of the various 404(b) evidence?

Appellant's Brief at 4 (capitalization omitted).

The principles governing our review are as follows:

> [O]ur scope of review "is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party." . . . We defer to the PCRA court's factual findings and credibility determinations supported by the record. In contrast, we review the PCRA court's legal conclusions *de novo*.

*Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 779 (Pa. Super. 2015)

(*en banc*) (citations omitted).

It is well settled that

> [c]ounsel is presumed effective, and in order to overcome that presumption a PCRA petitioner must plead and prove that: (1) the legal claim underlying the ineffectiveness claim has arguable merit; (2) counsel's action or inaction lacked any reasonable basis designed to effectuate petitioner's interest; and (3) counsel's action or inaction resulted in prejudice to petitioner.

*Commonwealth v. Mason*, 130 A.3d 601, 618 (Pa. 2015) (citations omitted). The petitioner must plead and prove all three prongs, and the failure to establish any one prong warrants denial of an IAC claim. *Id.*

Appellant's first two arguments, which we address jointly, allege that the PCRA court erred in denying Appellant's IAC claims that trial counsel were ineffective for failing to litigate properly meritorious suppression issues. Appellant asserts that he could not have knowingly or intelligently waived his *Miranda* rights for his second statement on August 18, 2011, because

Attorney Bacher was prevented from contacting Appellant during the interview. Appellant further contends that trial counsel should have called Attorney Bacher to testify at the suppression hearing to support this claim.

The PCRA court opined that Appellant's claims lacked merit because Appellant was given *Miranda* warnings before his second statement, did not request a lawyer, and was not aware that Attorney Bacher was at the barracks. PCRA Ct. Op. & Order, 4/11/17, at 6, 8. The court further suggested that Appellant's family could not have invoked Appellant's right to counsel and that Attorney Bacher's testimony at the suppression hearing would have been irrelevant. For the reasons that follow, we agree with the PCRA court's analysis.

The validity of a waiver of *Miranda* rights is a question of law. *Commonwealth v. Knox*, 50 A.3d 732, 746 (Pa. Super. 2012) (citations omitted). A defendant's waiver must be "voluntary, in the sense that [the] defendant's choice was not the end result of governmental pressure[ and] knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice." *Commonwealth. v. Pruitt*, 951 A.2d 307, 318 (Pa. 2008) (citation omitted).

"*Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the [suspect's] right against compulsory self-incrimination [is] protected.'" *Moran v. Burbine*, 475 U.S. 412, 424 (1986) (citations omitted). Under the Fifth Amendment,

the right to counsel protects a defendant's "desire to deal with the police only through counsel in order to counteract the inherent pressures of custodial interrogation." ***Commonwealth v. Santiago***, 599 A.2d 200, 202 (Pa. 1991). That right is personal and cannot be invoked by another party. ***Commonwealth v. Hall***, 701 A.2d 190, 198 (Pa. 1997). The privilege against self-incrimination in Article I, Section 9 of the Pennsylvania Constitution "tracks the protection afforded under the Fifth Amendment." ***Commonwealth v. Arroyo***, 723 A.2d 162, 166 (Pa. 1999) (citations omitted).

In at least two decisions in the 1970s, the Pennsylvania Supreme Court condemned the practice of preventing an attorney from contacting a defendant during an interrogation. In ***Commonwealth v. Harmon***, 269 A.2d 744 (Pa. 1970) (*per curiam*), the Court affirmed a trial court's suppression of a confession concluding that the facts of that case "disclose[d] the use of tactics in the securing of the challenged statement which we cannot condone." ***Id.*** at 746. However, the Court expressly declined to reach "the issue of whether or not the challenged statement was secured under impermissible constitutional circumstances[.]" ***Id.***

In ***Commonwealth v. Hilliard***, 370 A.2d 322 (Pa. 1977), a plurality of the Court asserted: "If counsel has expressed a desire to be present during interrogation, a waiver of counsel obtained in counsel's absence should be held invalid as a matter of law." ***Id.*** at 324 (Roberts J., with O'Brien and Manderino, JJ. joining). In support, the ***Hilliard*** plurality relied on prior

dissenting Pennsylvania Supreme Court opinions, as well as a decision of the New York Court of Appeals. *Id.* (citing *Commonwealth v. Yates*, 357 A.2d 134, 136 (Pa. 1976) (Roberts, J. dissenting, joined by Nix and Manderino, JJ.), *Commonwealth v. Hawkins*, 292 A.2d 302, 309 (Pa. 1972) (Nix, J. dissenting, joined by Roberts and Manderino, JJ.), and *People v. Hobson*, 348 N.E.2d 894 (N.Y. 1976)).

Subsequently, in 1986, the United States Supreme Court clarified the Fifth Amendment right to counsel in *Moran*. In that case, the defendant waived his *Miranda* rights before an interrogation, but police officers had prevented an attorney, whom the defendant's sister attempted to retain, from contacting the defendant during the ensuing interrogation. *Moran*, 475 U.S. at 417-18. The defendant was unaware of his sister's attempt to secure counsel for him or counsel's attempt to contact him. *Id.* at 417.

Following his conviction for murder and an unsuccessful appeal in state court, the defendant sought *habeas corpus* relief in the federal courts. *Id.* at 418-19. The defendant asserted, in part, that the conduct of the police violated his Fifth Amendment rights. *Id.* at 419. A circuit court of appeals agreed with the defendant and ordered a new trial, but the United States Supreme Court reversed the circuit court's order.

The *Moran* Court concluded that the refusal to allow the attorney to see the defendant during the interrogation did not affect the validity of the defendant's waiver of his *Miranda* rights. *Id.* at 421.

- 12 -

Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. . . . Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* at 422-23 (footnote omitted).

The *Moran* Court rejected the circuit court's determination that the deliberate conduct of the police officers in preventing an attorney from contacting the defendant was relevant to the defendant's waiver of his *Miranda* rights. *Id.* at 423.

Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.

*Id.* at 423-24.

The *Moran* Court further concluded that it would be inappropriate, under *Miranda*, to require the police to inform a defendant that an attorney was attempting to reach him. *Id.* at 425. The Court emphasized that *Miranda* carefully balanced society's interests "in finding, convicting, and punishing those who violate the law" with the "substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion." *Id.* at 426. The Court concluded that requiring the police to advise a suspect that an attorney wanted to contact him would only minimally advance the policy of dispelling

the coercion inherent in a custodial interrogation, while substantially burdening society's interests in legitimate law enforcement. *Id.* at 427.

Pennsylvania courts have adopted *Moran* and rejected claims that a *Miranda* waiver was invalid because the police failed to inform a defendant that an attorney was attempting to contact him. The Pennsylvania Supreme Court in *Arroyo* and this Court, in *Commonwealth v. Rushing*, 71 A.3d 939 (Pa. Super. 2013), *rev'd on other grounds*, 99 A.3d 416 (Pa. 2014), have concluded that *Moran* foreclosed similar arguments based on the federal constitution.[7] *See Arroyo*, 723 A.2d at 166; *Rushing*, 71 A.3d at 951.

Instantly, although Appellant relies on cases such as the *per curiam* decision in *Harmon* and plurality decision in *Hilliard*, the more recent Pennsylvania decisions on the Fifth Amendment right to counsel follow the approach set forth in *Moran*. *See Arroyo*, 723 A.2d at 166; *Rushing*, 71 A.3d at 951. Accordingly, we agree with the PCRA court's conclusion that the conduct of the PSP troopers who prevented Attorney Bacher from contacting Appellant did not vitiate Appellant's otherwise knowing, intelligent and voluntary waiver of his *Miranda* rights. Thus, we discern no basis to disturb

---

[7] As noted in *Rushing* and by Appellant, other states have held that the practice of refusing to allow an attorney access to a defendant may invalidate a *Miranda* waiver.

the trial court's conclusion that Appellant failed to establish arguable merit to his first two IAC claims.[8]

Appellant next contends that trial counsel were ineffective for failing to object to Corporal Courtright's testimony indicating that Appellant's first statement was given voluntarily. A more detailed background to this claim follows. During trial, the Commonwealth called Corporal Courtright. The corporal testified that on August 12, 2011, he received a report of the shooting and went to the PSP barracks in Ephrata. There, the corporal obtained information about the shooting, as well as a report that troopers had taken Appellant and Appellant's father into custody and transported them to the PSP barracks in Harrisburg. The corporal went to the PSP barracks at Harrisburg and met with Appellant.

Corporal Courtright and Trooper Chadwick Roberts interviewed Appellant beginning at 1:45 a.m. on August 13, 2011. N.T. Trial, 3/5/13, at 1796. When describing Appellant's waiver of his *Miranda* rights, the following exchange occurred:

> [Commonwealth's counsel]. When these rights were being reviewed with [Appellant], did he indicate his understanding of these rights?
>
> [Corporal Courtright]. Yes.

---

[8] Because the PCRA court considered the merits of this claim, we need not consider the PCRA court's alternative suggestion that Appellant's claim was previously litigated because this Court affirmed the trial court's suppression ruling in the direct appeal. *See* PCRA Ct. Op. & Order at 6, n.3.

Q. While these rights were being reviewed with [Appellant], did he ask any questions?

A. No.

Q. While these rights were being reviewed with [Appellant], did he request either clarification or explanation of these rights?

A. No.

Q. While these rights were being reviewed with [Appellant], were you able to understand him if he said anything while these rights were being reviewed?

A. Yes.

Q. Was [Appellant] under any apparent influence of alcohol?

A. No.

Q. Was [Appellant] under any apparent influence of controlled substances?

A. No.

Q. If [Appellant] had exhibited any difficulty conversing with or understanding you, would you have proceeded with the interview?

A. No.

Q. Did you or Trooper Roberts make any express or implied promise or consideration in exchange for [Appellant] providing you with a statement?

A. No.

Q. Did you or Trooper Roberts force, coerce or threaten [Appellant] to provide a statement?

A. No.

Q. **To the best of your knowledge, was [Appellant's] agreement to provide a statement a free and voluntary act?**

A. **Yes.**

Q. If you had determined that [Appellant's] agreement was not a free and voluntary act, would you have proceeded with the interview?

A. No.

*Id.* at 1802-04 (emphasis added). Shortly following this exchange at trial, the Commonwealth played the audio recording of Appellant's first statement to the jury. *Id.* at 1806.

At the PCRA hearing, Attorney Charles—Appellant's private trial attorney—explained the decision not to object to Corporal Courtright's suggestion that Appellant's statement was free and voluntary.

> We had attacked the voluntariness of the confession but the [suppression] ruling was against us.
>
> What we wanted to convey to the jury was that [Appellant] did go to the police station on two occasions, waived his *Miranda* rights, and was cooperating with the police, because this was an accident, not an intentional killing. So in him saying to the jury that it was a voluntary statement, well, the [c]ourt already ruled that that was the case. Essentially, I'm going to make the best out of that as I can, you know, turn lemons into lemonade; try to argue that he is being cooperative with the police. So if that statement was made, and I'm certain it was, it wasn't something that was a key point to me.

N.T. PCRA Hr'g, 9/14/16, at 34.

The PCRA court denied Appellant's claim that trial counsel were ineffective, opining that the decision not to object was supported by a reasonable trial strategy.

Appellant, in his brief, renews his IAC claim that trial counsel should have objected to Corporal Courtright's testimony indicating that Appellant's agreement to provide a statement was a free and voluntary act. With respect

to the alleged unreasonableness of Attorney Charles' explanation for declining to object, Appellant asserts:

> Likewise, the second prong of the PCRA test was met. Trial counsel testified at the PCRA hearing that he did not object to Cpl. Courtright's opinion testimony. He stated that he did not object to it because in its pre-trial ruling the court already permitted the statements to come in at trial and he was attempting to "turn lemons in to [*sic*] lemonade." He stated in the end Cpl. Courtright's statement was not "a key point to me."

Appellant's Brief at 29-30 (citations omitted).

When reviewing a PCRA court's determination that a reasonable basis existed for counsel's action or omission, we are mindful that

> [g]enerally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

***Commonwealth v. Colavita***, 993 A.2d 874, 887 (Pa. 2010) (citations and quotation marks omitted).

Having reviewed the record, the PCRA court's ruling, and Appellant's arguments, we agree with the PCRA court's ruling that Attorney Charles stated a reasonable basis for declining to object to Corporal Courtright's testimony. Appellant's boilerplate argument fails to demonstrate that Attorney Charles' explanation was unreasonable. Moreover, we find no basis in the record to conclude that there was any greater potential for success in objecting to the

corporal's passing reference to Appellant's waiver of his **Miranda** rights.  **See**

**Colavita**, 993 A.2d at 887.  Because Appellant has not demonstrated that trial

counsel lacked a reasonable basis for not objecting to the foregoing exchange,

this IAC claim warrants no relief.  **See Mason**, 130 A.3d at 618.

Appellant next contends that the PCRA court erred in rejecting his IAC

claim based on trial counsels' failure to request a *corpus delicti* jury

instruction.  At the outset, we reiterate that Appellant gave two statements to

police following the shooting.  At trial, the Commonwealth played an audio

recording of the first statement to the jury.  Although the audio recording,

marked as Commonwealth's exhibit 10, was admitted into the trial record, a

separate transcribed statement was not admitted into evidence.  The second

statement was transcribed and marked as an exhibit.  The Commonwealth

and the defense referred to portions of statements when examining Corporal

Courtright and Trooper Roberts, but neither party moved the exhibit into

evidence at trial.

At the PCRA hearing, Appellant asked Attorney Charles about his

decision not to request a *corpus deliciti* instruction.   Attorney Charles

responded that he believed the *corpus delicti* rule did not apply.

The PCRA court denied relief on this issue, concluding that Appellant's

arguments lacked arguable merit.  According to the court, the *corpus delicti*

rule did not apply because Appellant's statements were exculpatory in nature.

Alternatively, the court concluded that Appellant could not show prejudice

based on its instructions to the jury that it was bound to find Appellant guilty

beyond a reasonable doubt and its instructions regarding the voluntariness of Appellant's statements.

In his argument on appeal, Appellant asserts that the PCRA court erred in concluding that the *corpus delicti* rule did not apply because his statements were exculpatory. Appellant further suggests that the prejudice resulted because Appellant's statements were crucial to the Commonwealth's case. In light of the defense's theory that the shooting was accidental, Appellant contends, the failure to request the instruction was unreasonable because it conceded that a crime had occurred.

It is well settled that

> [t]he *corpus* [*delicti*] . . . rule places the burden on the prosecution to establish that a crime has actually occurred before a confession or admission of the accused connecting him to the crime can be admitted. The Commonwealth need not prove the existence of a crime beyond a reasonable doubt as an element in establishing the *corpus delicti* of a crime, but the evidence must be more consistent with a crime than with [an] accident. The *corpus delicti*, or body of the crime, may be proven by circumstantial evidence.

Our Court has explained:

> Establishing the *corpus delicti* in Pennsylvania is a two-step process. The first step concerns the trial judge's admission of the accused's statements and the second step concerns the fact finder's consideration of those statements. In order for the statement to be admitted, the Commonwealth must prove the *corpus delicti* by a preponderance of the evidence. In order for the statement to be considered by the fact finder, the Commonwealth must establish the *corpus delicti* beyond a reasonable doubt.

***Commonwealth v. Murray***, 174 A.3d 1147, 1154 (Pa. Super. 2017) (citations and quotation marks omitted).

"The *corpus delicti* in a homicide case consists of proof that the person for whose death the prosecution was instituted is in fact dead and that the death occurred under circumstances indicating that it was criminally caused by someone." ***Commonwealth v. Dupre***, 866 A.2d 1089, 1097-98 (Pa. Super. 2005) (citations, quotation marks, and emphasis omitted). Pennsylvania Suggested Standard Criminal Jury Instruction 3.02B sets forth the following model instruction on *corpus delicti* in a homicide case:

> 1. As I told you, you may not consider the statement as evidence against the defendant unless you find beyond a reasonable doubt that a crime was committed. To consider the statement as evidence, you must be satisfied beyond a reasonable doubt by all of the evidence, excluding the statement, that *[name of victim]* is dead and that [his] [her] death was probably caused by someone feloniously killing [him] [her].
>
> 2. The other evidence need not tend to show that the crime was committed by the defendant only that the crime was committed by someone. Furthermore, the other evidence need not rule out all possibility of accident or suicide. It is enough if you are satisfied beyond a reasonable doubt that the circumstances are more consistent with death having been caused by a felonious killing than in some other way.
>
> 3. The object of these rules is to guard against convicting a person of a crime that never really happened even though the defendant confessed to it.

Pa. SSJI (Crim) § 3.02B.

Generally, when this Court reviews the trial court's instructions,

> [a] jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide

discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the [defendant] was prejudiced by that refusal.

*Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013) (citation omitted).

In *Commonwealth v. McMullen*, 681 A.2d 717 (Pa. 1996), the decedent, who was a schizophrenic, was known to take long walks, engage in risky behavior, and indeed was previously struck by a car during one of his walks. *Id.* at 718, 720. In February 1985, the decedent's body was found in a creek eight days after the burglary of a food store. *Id.* at 718. The decedent was found within 500 yards of two bridges spanning the creek. *Id.* An autopsy of the decedent revealed no signs of foul play, and his death was initially ruled to be an accidental drowning. *Id.* However, rumors about the decedent's death and the burglary of the food store persisted. *Id.*

Four years later, the Pennsylvania State Police reopened the investigations into both the decedent's death and the burglary at issue. *Id.* During the renewed investigation, the defendant gave a statement to police that he and another person burglarized the food store and while fleeing from the burglary, encountered the decedent on a bridge. *Id.* The defendant asserted that his cohort threw the decedent off the bridge. *Id.*

Following a trial at which the defendant's statement was admitted, a jury found the defendant guilty of burglary and second-degree murder. *Id.* at 720. The defendant appealed to this Court arguing that the Commonwealth

failed to establish *corpus delicti*. *Id.* On direct appeal, this Court reversed the trial court and ordered a new trial. We concluded the independent evidence in that case did not establish that the decedent's death was more likely a homicide than an accident. *Id.* The Commonwealth appealed to the Pennsylvania Supreme Court.

The ***McMullen*** Court affirmed this Court's determination that *corpus delicti* was lacking with respect to the homicide.[9] The Court first rejected the Commonwealth's argument that the *corpus delicti* rule did not apply because the defendant blamed his cohort for throwing the decedent off the bridge. *Id.* at 721. Instead, the Court concluded that the defendant's statement was inculpatory for the purposes of the *corpus delicti* rule, because the defendant's statement was the sole evidence establishing the defendant's presence at the scene of the crime and a possible motive to kill the decedent. *Id.*

The ***McMullen*** Court proceeded to consider the evidence presented at trial.

> In the present matter, we have no difficulty concluding that the evidence independent of [the defendant's] statement was insufficient to establish the *corpus delicti* for the homicide charge. The only evidence pointing to foul play were the bruises and lacerations on the decedent's face, and the pathologist could not conclude that these blows were more likely caused by an assailant than they were by decedent's striking objects after falling into the water. On the other hand, much evidence pointed to the decedent's death being an accident, including the lack of signs of a struggle and decedent's own behavior. Most notably, no new evidence other than [the defendant's] statement surfaced

---

[9] The ***McMullen*** Court, however, reversed this Court's award of a new trial for burglary because there was ample independent evidence of that crime.

- 23 -

> between the time of the original findings of accidental death and the reopening of the burglary and death investigations.

***Commonwealth v. McMullen***, 681 A.2d at 722 & n.5. (footnote omitted).

In light of ***McMullen***, we agree with Appellant that the mere fact that he asserted the shooting was accidental did not render the statement exculpatory for the purposes of the *corpus delicti* rule. As in ***McMullen***, Appellant's statements contained averments that suggested a possible motive, including Appellant's statement that he intended to "devil" Walsh, when she was ignoring him and reading her book.

Nevertheless, this is not a case where the traditional policies underlying the *corpus delicti* rule are implicated. There was ample independent evidence that established *corpus delicti*. Walsh was shot in the forehead, and it was undisputed that the wound was not self-inflicted. It was also established that Appellant was the only other person in the room. The .22 caliber pistol at issue had several safety features that would have made an accidental discharge unlikely if the magazine were removed. Moreover, although the firearm did not have the magazine in place when Appellant turned over the weapon to first responders, there was still an unfired cartridge loaded in the weapon. The evidence further established that the weapon was almost fully loaded at the time of shooting. Thus, the independent evidence established that it was more likely that the discharge of the firearm was criminal rather than accidental because Appellant knowingly pointed a loaded firearm at Walsh's head.

Therefore, we conclude that Appellant's IAC claim based on the failure to request a *corpus delicti* instruction lacked arguable merit.[10] Moreover, even assuming that an instruction was warranted, Appellant failed to demonstrate prejudice in light of the independent evidence establishing that it was more likely that Walsh was killed by a criminal act than by an accident. Accordingly, no relief is due. *See Mason*, 130 A.3d at 618.

Appellant, in his final issue, asserts that the PCRA court erred in denying relief on his IAC claim based on trial counsels' failure to request a cautionary instruction regarding the prior bad acts evidence admitted in this case. For purposes of our discussion, we initially summarize the prior bad acts evidence presented by the Commonwealth at trial.

First, Danielle Detweiler testified that she dated Appellant for over one year in high school, approximately five years before the trial and three years before the shooting. N.T., 3/7/13, at 2341. Danielle stated that Appellant "had a handgun that he said was his grandpa's. And he said it didn't work." *Id.* at 2343. According to Danielle, Appellant pointed that handgun at her on several occasions. *Id.* The first time Appellant pointed the gun at her, Appellant "was, like joking around." *Id.* at 2344. The other times occurred when "he would get erratic and angry." *Id.*

Danielle also testified that Appellant had several "airsoft" guns that he would "play around with[.]" *Id.* She stated, however, that he would "also

_____

[10] *See Commonwealth v. Wiley*, 966 A.2d 1153, 1157 (Pa. Super. 2009) (reiterating that this Court may affirm the PCRA court on a different basis).

shoot [her] if he got mad." *Id.* She asserted that there were more than ten incidents in which Appellant shot her and that Appellant would shoot her more than once during each incident. *Id.* According to Danielle, the shots would leave marks about her arms and legs, and on one occasion, Appellant hit her on the toe, and her toenail broke off a couple of days later. *Id.* at 2345, 2348.

Danielle recalled one specific incident in which Appellant shot her with the "airsoft" gun:

> [Commonwealth's counsel]. How close did he ever get when he shot you with the pellet gun?
>
> [Danielle Detweiler]. He held me down and shot me while he was on top of me, --
>
> Q. When --
>
> A. Like up against.
>
> Q. In that instance, where did he shoot you?
>
> A. In my vagina.
>
> Q Let me be a little more clear.
>
>   Were your panties on when he shot you there?
>
> A. I had very thin mesh panties on.
>
> [Commonwealth's counsel]: Nothing further.

*Id.* at 2348-49.

Second, Devon Detweiler, Danielle's sister, testified that she observed Appellant shoot Danielle with the "airsoft" gun "like, a couple of times when he was actually angry with her." *Id.* at 2364. Danielle would tell him to stop, but Appellant would "keep going with it." *Id.* at 2366. Devon testified that

she would see bruises on Danielle's legs and arms after Appellant shot her with the "airsoft" gun. *Id.* at 2366.

Third, Gregory Miller testified that he was friends with Appellant. He stated, in relevant part, that "[Appellant] was verbally abusive to [Walsh] pretty much constantly from the time they started dating onward. . . . He referred to her with just about every common insult. I heard he referred to her regularly as a bitch, a slut, a whore, and on more than one occasion like a cunt or nigger."[11] *Id.* at 2385. Miller continued to testify that Appellant would "become angry at [Walsh], would say things like, you remember I have guns at home, right? And would frequently remind her that he had firearms and ammunition when he was angry with her." *Id.* at 2386. Appellant threatened to "pistol whip" Walsh on one occasion. *Id.*

Fourth, the Commonwealth admitted a July 21, 2011 Facebook exchange between Walsh and her sister, Megan Walsh. The exchange contained the following statements:

> [Walsh] I am so[12] tempted to just pack all my shit up, but I'm deathly afraid of his reaction.
>
> [Megan] What would he do?
>
> [Walsh] Probably flip out and pull a gun on me knowing him.

*Id.* at 2317-19.

---

[11] Both Appellant and Walsh were white.

[12] The trial testimony and this Court's direct appeal decision indicate that Walsh used capital letters to write "SO."

In Appellant's direct appeal, this Court concluded that the evidence of the Facebook exchange should not have been admitted. Specifically, we noted that the exchange should not have been admitted under the state of mind exception to the rule against hearsay because "the logical connection between [Walsh]'s statement of fear and [Appellant's] malice [wa]s not obvious." **Becker**, 1801 MDA 2013, at 13 (discussing, *inter alia*, Pa.R.E. 803.03 and **Commonwealth v. Luster**, 71 A.3d 1029 (Pa. Super. 2013)). This Court proceeded to engage in a harmless error analysis:

> The significance of the cartridge recovered in the chamber is that the magazine must have been in the gun for the next cartridge to have been chambered after Walsh was shot. When [Appellant] was first interviewed in the early hours of August 13, 2011, he told police the shooting was an accident based upon his claim there was no magazine in the gun and he believed the gun was empty. However, when the gun was recovered, a live cartridge was in the chamber. The fact that there was a cartridge in the chamber after the gun had been fired disproved [Appellant]'s statement to police that the magazine was not in the gun at the time of the shooting. In light of this critical evidence, which fully supports the Commonwealth's theory that [Appellant] knowingly pointed a loaded gun at Walsh, we conclude the admission of Megan Walsh's testimony of her sister's Facebook statements was harmless error.

*Id.* at 14-15 (record citations and footnote omitted).

Instantly, both the PCRA court and the Commonwealth concede in this appeal, and we agree, that Appellant's underlying IAC claim had arguable merit and that trial counsel failed to articulate a reasonable strategic basis for

failing to request a cautionary instruction.[13]  Therefore, the sole question with respect to this IAC claim is whether Appellant established prejudice.

> Appellant contends:
>
> Cautionary instructions under the circumstances were crucial to decrease the danger of unfair prejudice. Furthermore, the evidence against [Appellant] was circumstantial at best. In such a case, there was simply no way to ascertain the weight the jury gave to this highly damaging testimony and the potential it had to improperly influence the jury.

Appellant's Brief at 47.

---

[13] It is well settled that "[e]vidence of a defendant's prior bad acts is generally inadmissible, and where such evidence is admitted, a defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose." *Commonwealth v. Hutchinson*, 811 A.2d 556, 561 (Pa. 2002) (citation omitted).  In this case, Attorney Holihan testified that he intended to request a limiting instruction, but conceded that no request was made and there was not a strategic basis for the omission.  N.T. PCRA H'rg, 9/14/16, at 66-67.

Pennsylvania Standard Suggested Jury Instruction 3.08 recommends the following instruction regarding prior bad acts:

> 1. You have heard evidence tending to prove that the defendant was guilty of . . . [improper conduct] for which [he] [she] is not on trial.  I am speaking of the testimony to the effect that *[explain testimony]*.
>
> 2. This evidence is before you for a limited purpose, that is, for the purpose of tending to [show *[give specifics]*] [contradict *[give specifics]*] [rebut *[give specifics]*] *[give specifics]*.  This evidence must not be considered by you in any way other than for the purpose I just stated.  You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

Pa. SSJI (Crim) § 3.08.

The Commonwealth responds that the PCRA court properly concluded that any error did not result in prejudice. Both the Commonwealth and the PCRA court refer to this Court's prior conclusion that any error in admitting Walsh's prior statements to her sister regarding Walsh's fear of Appellant was harmless beyond a reasonable doubt. According to the Commonwealth:

> [T]here is no question that [Appellant] shot [Walsh]—who he knew to be pregnant—in the head at close range. [Appellant's] assorted contradictory statements notwithstanding, it is also clear that the gun was loaded, with the magazine in it at the time he pulled the trigger. The evidence also showed that [Appellant] did not take efforts to summon emergency assistance, and did not administer first aid to the victim at the scene. Without the Rule 404(b) evidence, the physical evidence, combined with [Appellant]'s contradictory and self-serving statements, make clear that [Appellant] possessed the requisite intent to kill . . . Walsh, and the requisite malice that led to the death of her unborn child.
>
> Further, this Honorable Court held on direct appeal that the improper admission of certain 404(b) evidence in and of itself constituted harmless error. [**Becker**, 1801 MDA 2013, at 14-15]. As noted by the PCRA court, "[i]f the admission of the evidence itself was deemed harmless, the failure to request a limiting instruction under the circumstances would also be harmless."
>
> As such, [Appellant] was not prejudiced by the failure to issue a limiting instruction.

Commonwealth's Brief at 34-35 (some citations omitted).

The Pennsylvania Supreme Court has defined prejudice for the purposes of the PCRA as follows:

> [A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it "could have reasonably had an adverse effect on the outcome of the proceedings." [**Commonwealth v. Pierce**, 527 A.2d 973, 977

- 30 -

(Pa. 1987)]. This standard is different from the harmless error analysis that is typically applied when determining whether the trial court erred in taking or failing to take certain action. The harmless error standard, as set forth by this Court in **Commonwealth v. Story**, . . . 383 A.2d [155], 164 [(Pa. 1978)] (citations omitted), states that "[w]henever there is a 'reasonable possibility' that an error 'might have contributed to the conviction,' the error is not harmless." This standard, which places the burden on the Commonwealth to show that the error did not contribute to the verdict beyond a reasonable doubt, is a lesser standard than the **Pierce** prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship of counsel. In a collateral attack, we first presume that counsel is effective, and that not every error by counsel can or will result in a constitutional violation of a defendant's Sixth Amendment right to counsel.

**Commonwealth v. Spotz**, 84 A.3d 294, 315 (Pa. 2014) (some citations omitted).

We reiterate that Appellant was charged with homicide for the killing of Walsh and homicide of an unborn child. **See** 18 Pa.C.S. §§ 2502, 2604. The jury convicted Appellant of first-degree murder with respect to Walsh, 18 Pa.C.S. § 2503(a), and third-degree murder of an unborn child, 18 Pa.C.S. § 2604(c). The jury was instructed that both charges require malice, but the first-degree murder conviction required proof that Appellant specifically intended to kill Walsh. **See Commonwealth v. Williams**, 176 A.3d 298, 306 (Pa. Super. 2017) (stating that "[a]n individual commits first-degree murder when he intentionally kills another human being; an intentional killing is defined as a 'willful, deliberate and premeditated killing.'" (citation omitted)); **see also Commowealth v. Santos**, 876 A.2d 360, 363 (Pa. 2005) (stating

that "to convict a defendant of the offense of third-degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. [M]alice 'comprehends not only a particular ill-will, but . . . [also a] wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.'" (citations and emphasis omitted)).

In *Commonwealth v. Billa*, 555 A.2d 835 (Pa. 1989), the defendant was convicted of murder, robbery, escape, and possessing an instrument of crime and sentenced to death. *Id.* at 837-39. The evidence against the defendant included the defendant's admissions that he took jewelry from the decedent, and during an altercation with her, the defendant stabbed her. *Id.* at 838. The defendant then struck her in the head with an aluminum bat. *Id.* Additionally, a pillowcase containing the defendant's clothes were stained by type-O blood, which was consistent with the decedent's blood type. *Id.*

At trial, in *Billa*, the Commonwealth called the victim of a prior robbery and rape committed by the defendant two months before the killing of the decedent. *Id.* In that incident, the defendant strangled the decedent, stating that he could not let her go because she would go to the police. *Id.* The Commonwealth asserted the evidence showed *modus operandi* and the defendant's intent to kill and also negated the defendant's claim that the stabbing of the decedent was accidental. *Id.*

The *Billa* Court concluded that the evidence of the prior rape was admissible, but proceeded to consider whether trial counsel was ineffective for

failing to request a cautionary instruction. *Id.* at 841. The Court noted that a cautionary instruction is generally necessary when prior bad acts evidence is admitted to address "the potential for misunderstanding on the part of the jury when this type of evidence is admitted." *Id.* (citation and emphasis omitted). The Court found that the failure to issue a cautionary instruction in that case was prejudicial because

> [i]t is clear that the challenged evidence in this case, the vivid description by a prior rape victim of [the defendant's] violent sexual assault against her, was highly inflammatory and created the substantial danger that the jury could be swayed in its deliberations on the degree of guilt by this evidence showing [the defendant's] criminal character and his propensity to sexually assault young Hispanic females. Such evidence was relevant and admissible as the trial court ruled, but the court erred in failing to give an immediate and complete cautionary or limiting instruction to the jury explicitly instructing the jury as to the limited purposes for which the evidence was deemed admissible. Such an instruction neither preceded nor followed the introduction of said evidence, nor was a limiting instruction given in its final charge to the jury. Without such instruction, the jury was left without guidance as to the use it could legitimately make of the inflammatory evidence and may have been more inclined, therefore, to convict the [defendant] of first degree murder because he had assaulted and intended to kill his prior victim.

*Id.* at 841-42. The Court continued: "Given the highly inflammatory and extensive nature of the evidence of the prior sexual assault, we cannot say with any reasonable certainty that the jury would have returned the same verdict of murder of the first degree had it been properly instructed." *Id.* at 843.

- 33 -

In **Commonwealth v. Hutchinson**, 25 A.3d 277 (Pa. 2011), the defendant filed a PCRA petition after his conviction for murder and other offenses were affirmed on direct appeal. *Id.* at 283-84. The defendant, in relevant part, alleged that he was entitled to relief based on the admission of, and trial counsel's failure to request a cautionary instruction on, the following prior bad acts: (1) testimony from a murder victim's sister that the defendant previously assaulted the victim and attempted to force himself on her, (2) evidence that the defendant's former paramour had previously obtained a protection from abuse order against the defendant, (3) testimony that the defendant threatened to kill the victim's estranged husband, and (4) testimony that the defendant used aliases. *Id.* at 299. The first two acts were litigated in a direct appeal and found to be harmless based on overwhelming evidence of guilt. *Id.* at 299-300. The third act—threatening the victim's husband—was raised by the defense during the defense's cross-examination. *Id.* at 299-300. The fourth act presented by the Commonwealth was deemed highly relevant to establish the victim sought a protection from abuse order against Appellant and to tie him to a cell phone and his flight from Pennsylvania following the murder. *Id.* at 305.

The **Hutchinson** Court rejected the defendant's IAC claim based on counsel's failure to request a cautionary instruction. *Id.* at 305-06. The Court reasoned:

> The bad acts evidence of which [the defendant] complains was not inflammatory, not graphic, and not extensive. Some of the evidence was elicited as a single sentence in passing during cross-

examination of the witnesses by defense counsel. In closing argument, the Commonwealth did make reference to [the defendant]'s abuse of the victim, but did not mention the other bad acts. Under these circumstances, an instruction as to the bad acts evidence may very well have served only to re-emphasize the evidence to the jury. More importantly, [the defendant] has not established prejudice, *i.e.*, he has failed to demonstrate that there is a reasonable probability that the outcome of his trial would have been different but for the lack of a limiting instruction. We have previously noted the "overwhelming evidence" of the defendant's guilt. In light of this overwhelming evidence, which includes eyewitness testimony of the victim's two children, both of whom knew [the defendant], [the defendant] has failed to suggest how he could have been prejudiced by counsel's failure to request a limiting instruction such that there is a reasonable probability that the outcome of his trial would have been different.

*Id.* at 306 (citation omitted).

We conclude that this case falls closer to **Hutchinson** than **Billa**. The Commonwealth was permitted to admit evidence of Appellant's prior bad acts, including Appellant's treatment of and use of "airsoft" guns against Danielle Detweiler. The evidence was admissible to prove ill-will, absence of mistake and motive. Additionally, the evidence that Appellant verbally abused and threatened Walsh presented through Miller was probative to rebut Appellant's description of his relationship with Walsh.

Even if the evidence was prejudicial, it was not unfairly prejudicial. The evidence did not tend to show that Appellant would have harbored a specific intent to kill on the night of the shooting. The incidents testified to by Detweiler only showed that Appellant had once brandished an actual firearm and that he shot her with plastic pellets from an "airsoft" gun. Similarly, although Miller's testimony established possible ill-will in the relationship

between Appellant and Walsh and that Appellant would threaten the use of firearms, there was no indication that Appellant would have employed a firearm with the specific intent to kill. Thus, unlike **Billa**, the prior bad acts evidence in the present case, while prejudicial, cannot be said to have impacted the jury's fair consideration of Appellant's innocence or guilt of first degree murder as opposed to third-degree or manslaughter. **See Billa**, 555 A.2d at 841-42.

Moreover, as in **Hutchinson**, there was overwhelming evidence of Appellant's malice and specific intent. Appellant had a nearly fully loaded pistol pointed at Walsh. Walsh was shot in a vital part of the body—*i.e.*, the head. Appellant gave inconsistent statements to investigators after the shooting. Appellant's statements and behavior suggested consciousness of guilt. We are also mindful that the jury heard Appellant's statement in full, including Appellant's assertion that he walked over to Walsh before the shooting to "devil" her. The Commonwealth further introduced evidence that Appellant did not attempt to resuscitate Walsh or call 911, and it was in the province of the jury to weigh that evidence and accept the Commonwealth's argument that Appellant's conduct following the shooting was consistent with a person who had intentionally killed another.

In light of the foregoing, we conclude that Appellant has failed to establish prejudice related to trial counsels' failure to request a cautionary instruction. **See Spotz**, 84 A.3d at 315; **Hutchinson**, 25 A.3d at 306.

Thus, having reviewed Appellant's arguments and concluded that they do not establish error in the PCRA court's rulings, we affirm.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/26/2018