J-S64008-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ZAIEE TALBERT | : | |
| | : | |
| Appellant | : | No. 495 EDA 2018 |

Appeal from the PCRA Order January 25, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0009688-2012,
CP-51-CR-0009690-2012

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                          **FILED NOVEMBER 14, 2018**

Zaiee Talbert appeals from the order that dismissed his petition filed

pursuant to the Post Conviction Relief Act ("PCRA").  We affirm.

This Court summarized the history of the underlying case as follows.

On March 12, 2012, at approximately 8:00 p.m., Officer Timothy Stephan ("Officer Stephan") responded to a call reporting gunshots.  After arriving at the scene, Officer Stephan found an all-terrain vehicle ("ATV") next to a parked van.  Officer Stephan found 17–year–old Dexter Bowie ("Bowie") and 18–year–old Jonathan Stokely ("Stokely"), one on either side of the van, both of whom were unconscious and suffering from multiple gunshot wounds.  Stokely was pronounced dead at the scene.  Bowie was transported to Temple University Hospital, where he was pronounced dead at 8:24 p.m.

Dr. Samuel Gulino ("Dr. Gulino"), Chief Medical Examiner of Philadelphia County, ruled each death a homicide.  Bowie suffered 13 gunshot wounds to the head, back, buttock, chest, abdomen, arm, thigh and foot, which caused injury to his intestine, liver and lung.  Stokely suffered at least 22 gunshot wounds, 15 of which were to the legs, with others to the back, abdomen, buttock and

lung. Eyewitnesses identified [Appellant] and Christopher Lloyd Butler ("Butler") as the shooters.

[Appellant] and Butler were arrested, and each was charged with two counts of murder and related charges. In September 2012, the Commonwealth filed a Pennsylvania Rule of Criminal Procedure 802 Notice of Aggravating Circumstances. In June 2013, the Commonwealth filed a Notice of Removal of Capital Designation. In February 2014, following a jury trial, the trial court declared a mistrial because the jury could not reach a verdict regarding the charges against [Appellant]. [The jury, however, found co-defendant Butler guilty of possession of an instrument of crime and two counts of first-degree murder.]

Following a second jury trial in November 2014, [Appellant] was acquitted of possessing instruments of crime, and convicted of two counts each of murder of the first degree and conspiracy. On January 30, 2015, the trial court sentenced [Appellant] to concurrent terms of life in prison for the murder convictions and 20–40 years in prison for the conspiracy convictions.

*Commonwealth v. Talbert*, 129 A.3d 536, 537-38 (Pa.Super. 2015) (footnotes omitted). This Court subsequently affirmed Appellant's judgment of sentence, and our Supreme Court denied his petition for allowance of appeal. *Id*., *appeal denied*, 138 A.3d 4 (Pa. 2016).

Appellant filed a timely *pro se* PCRA petition, followed by an amended petition through retained counsel and a later supplemental petition. After the Commonwealth filed a response, the PCRA court issued notice of its intent to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907. Appellant responded *pro se* with an amended petition, which was followed by another Rule 907 notice. Counsel then filed another supplemental petition which attached affidavits from Appellant's private investigator. The PCRA court, concluding that none of the filings presented issues of merit, dismissed

Appellant's petition by order of January 25, 2018. Retained counsel sought and was granted leave to withdraw. Newly-appointed counsel filed a timely notice of appeal.

Appellant presents this Court with the following questions.

1. Did the PCRA court err in dismissing Appellant's PCRA petition because trial counsel was ineffective for failing to object to prosecutorial misconduct during closing argument when the prosecutor stated to the jury that witnesses were afraid to testify at trial?

2. Did the PCRA court err in dismissing Appellant's PCRA petition without an evidentiary hearing when [Appellant] presented evidence of recantation evidence relating to eyewitness, Joseph Johnson?

Appellant's brief at 4 (unnecessary capitalization omitted).

We begin with legal principles relevant to our review. "When reviewing the denial of a PCRA petition, our standard of review is limited to examining whether the PCRA court's determination is supported by evidence of record and whether it is free of legal error." *Commonwealth v. Jordan*, 182 A.3d 1046, 1049 (Pa.Super. 2018).

Appellant's first claim relates to allegations that his trial counsel rendered ineffective assistance. Counsel is presumed to be effective, and a PCRA petitioner bears the burden of proving otherwise. *Commonwealth v. Becker*, 192 A.3d 106 (Pa.Super. 2018). To do so, the petitioner must plead and prove (1) the legal claim underlying his ineffectiveness claim has arguable merit; (2) counsel's decision to act (or not) lacked a reasonable basis designed

to effectuate the petitioner's interests; and (3) prejudice resulted. *Id*. The failure to establish any prong is fatal to the claim. *Id*.

The legal issue underlying Appellant's claim is that counsel failed to object to prosecutorial misconduct during the Commonwealth's closing statement. The following law applies to our review of that issue.

> With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. Our review of a prosecutor's comment and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. Thus, it is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial. Additionally, like the defense, the prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom. Moreover, the prosecutor is permitted to fairly respond to points made in the defense's closing, and therefore, a proper examination of a prosecutor's comments in closing requires review of the arguments advanced by the defense in summation.

*Commonwealth v. Jones*, 191 A.3d 830, 835–36 (Pa.Super. 2018) (quoting

*Commonwealth v. Jaynes*, 135 A.3d 606, 615 (Pa.Super. 2016)).

By way of background to Appellant's claim, witnesses whose testimony was admitted at Appellant's trial included Curtis Stokes, Joseph Johnson, and Lydia Santos. Mr. Stokes knew the parents of the victims, and knew Mr. Bowie

and Mr. Stokely as "Biggs" and "Bird" respectively.  Mr. Stokes testified that, on the day of the murders, he was in a bar on Clearfield Street in North Philadelphia, drunk and high.  N.T. Trial, 11/12/14, at 239-41.  He saw Bird and Biggs drive by twice on an ATV, but denied seeing Appellant or anyone with a gun.  *Id*. at 242-47.  He acknowledged hearing three or four gunshots. *Id*. at 250.  At trial, Mr. Stokes denied any recollection of telling the police that he saw Appellant pull a gun and drive after them, and mentioned that he was high at the time he was questioned.  He also spoke of a hospitalization that interrupted his questioning by police, and that he was on medication for his moods.  Mr. Stokes admitted that he was nervous about testifying and that he would be back out in the neighborhood after he left court.  *Id*. at 260-62. The Commonwealth questioned Mr. Stokes based upon a written statement that he acknowledged contained his signature.  The statement, given after he was taken to the homicide unit involuntarily, included representations that Mr. Stokes did not witness the shooting but did (a) see Bird ride past one way on the ATV, then come back the other way with Biggs; (b) see Appellant grab a gun from under a car, and follow after them with two other men; and (c) hear "a lot of gunshots" ten or fifteen minutes later.  *Id*. at 276; N.T. Trial, 11/13/14, at 102-33.

Mr. Johnson testified at Appellant's first trial, but could not be located for the second trial.  The Commonwealth offered evidence of its unsuccessful attempts to locate him and secure his appearance.  N.T. Trial, 11/14/14, at

267-88. Accordingly, the trial court determined that Mr. Johnson was unavailable and permitted the Commonwealth to read his former testimony into evidence. Mr. Johnson stated therein that he only came to testify because he was placed in custody; he had no intention to coming to court because he "didn't make no statement." *Id*. at 290-92. He acknowledged that he had been brought to see the homicide detectives, but proclaimed that he "kept saying I don't know nothing." *Id*. at 296. He denied reading or signing any statement. *Id*. at 301. Mr. Johnson indicated that, at Appellant's preliminary hearing, he refused to testify and was forcefully put on the witness stand after sheriffs handcuffed him and brought him to the courtroom. *Id*. at 302. He testified that he refused "[b]ecause don't nobody want to be sitting up on no stand." *Id*. at 303. When asked why not, Mr. Johnson indicated "that ain't a place I want to be." *Id*. When shown his police statement, Mr. Johnson denied that it was his signature on it. In that statement, Mr. Johnson told police that he was present when Bird and Bigg were shot, that they were shot by Appellant and Butler, and that Mr. Johnson did not say anything to anyone about it "because I don't want nothing coming at me." *Id*. at 333-35 ("I didn't see how it started, but what drew my eyes was the AK. It was loud as shit. It sounded like a war zone; bat, bat, bat, but nonstop. I looked over and it was [Appellant] and [Butler] lighting up two boys. [Appellant] had the AK going . . . ."). Mr. Johnson explained why he did not give a video statement: "I don't want to go on video because I do not want to get killed." *Id*. at 353.

- 6 -

Ms. Santos testified for the Commonwealth at the first trial, but was called as a witness for the defense in the trial at issue herein. She testified that she saw the shooting, described how it happened, and indicated that she was certain that Appellant was not one of the two men who did it. *Id*. at 197-210. On cross-examination, Ms. Santos acknowledged that she had to be held in custody before she testified in the first trial, and confirmed that she did not want to testify in the second "[b]ecause I feel nervous and I feel like why they driving me into this." *Id*. at 214. She admitted that she did not go to the police with the information she had, or tell anyone what she saw for "the same reason I don't want to be drug into this, because I'm scared for my life." *Id*. at 215; *see also id*. at 231 ("You are not going to do nothing for me. If something happen to me, who is going to help me out? Nobody? . . . I don't want to be involved."). She was then questioned about inconsistencies between her testimony and a statement she gave to the police when they came to her for information.

In his closing argument, counsel for Appellant attacked the credibility of Mr. Stokes by suggesting that he was compelled to go along with what the detectives were saying when they had him in custody for questioning, noting that Mr. Stokes was facing drug charges. N.T. Trial, 11/18/14, at 9-10. He also likened Mr. Johnson's circumstances to those of Mr. Stokes, pointing to the open charges Mr. Johnson faced when he was questioned by homicide detectives. *Id*. at 13. Counsel noted that the jury "heard about him being

afraid, supposedly, that he was somehow going to be killed if he went on video," but yet the Commonwealth represented that he signed the written statement. *Id*. at 14-15. Counsel further attacked Mr. Johnson's credibility, and contrasted the version of events he gave in his statement with the testimony of Ms. Santos, whom he described as "probably the most credible witness in this whole case." *Id*. at 17-18.

The prosecution's closing argument included the following, which forms the basis of Appellant's claim that counsel was ineffective in failing to object.[1]

> You know, a case like this, a murder so shocking in its brutality, you know, it affects people, even people like Mr. Johnson who you heard testimony was a drug dealer himself and is clearly not, you know, maybe not a model citizen. Even people like Mr. Stokes who's just, let's face it, Mr. Stokes is just a guy in the neighborhood that ain't trying to be involved in any of this stuff. Ms. Santos. You know, as much as we can denigrate these people and talk about mood pills, and drag them through the mud, the fact of the matter is these are human beings that have loved ones that live in this community. Mr. Johnson was as south of a witness as you will ever see. "South," meaning I didn't see, I don't know nothing. But what's the one thing he gave up at the preliminary hearing, even when he testified before. The one thing that he had no problem with is, yeah, they were like little brothers to me. Big[gs] and Bird were like little brothers.

> You think, Ladies and Gentlemen, in the days following this murder, these murders, that the people that loved these kids and that knew their family, like Mr. Stokes, he knew their father, their grandfather; Ms. Santos, who knew their mothers, knew the names of their mothers. Do you think in the days and the weeks

---

[1] Appellant in his brief points to only a few lines of the above to support his argument. *See* Appellant's brief at 13. However, as noted above, proper review of the merits of the claim requires consideration of the comments in context, and in light of the defense's closing arguments. *See* *Commonwealth v. Jones*, 191 A.3d 830, 835–36 (Pa.Super. 2018).

following this when this tragedy hung over in this neighborhood, when this community was in mourning over the loss of two young lives and the shocking brutality of the way they were taken, that maybe these people were feeling some kind of way about it? Maybe it wasn't that easy for them to be in this community and to talk to people who knew and loved these kids and talked to their family and act like they didn't know anything.

But there is one other emotion. There is one other thing that is very raw and very real that puts that feeling in check in a fair world. In a fair world, we can congratulate people who help us put people in jail. In a fair world, they line up at [the homicide detectives' office] when something brazen like this happens right out on the street and everyone on that block and everybody out on [nearby streets] they all say they weren't even wearing masks. I saw them. We don't live in that world. We live in Philadelphia. And here, you know what you get for being a homicide witness? You get scared. Even when you find the courage at one point when you're sitting there and you have homicide detectives are assuring you and you are thinking about how much I love these kids and I don't want this just happening to them and for them to be forgotten about. They're reduced to bloodstains on 9th Street.

When you find that courage, it's not easy to hold onto. In fact, when you're out in that street, you know what you get for it? The people who are thankful are in this courtroom. They're the people who are thankful, are in this courtroom. Outside of this courtroom there is a lifetime of looking over your shoulder. There is a lifetime of snitch, rat. There is a lifetime of being scared every time you are getting gritted on by somebody in the neighborhood.

So when you find that courage, then you've got to come up here exposed, you start to hear crazy things. You start to hear things like; not my signature. . . .

. . . .

. . . Let's not forget. We're talking about fear. After his ludicrous denials on the signature, do you know what Mr. Johnson's got to do? He's got to go back out in that neighborhood. You know what this time? This time, we're getting close to trial. Not show up at my probation officer. I know that's how they got me. And when highway patrol officers are turning the city upside down looking

for him, and he knows it, he's calling and talking to him, you know what he says? I would rather go to jail. . . .

*Id*. at 50-53.

From a review of the comments, in their proper context, and in light of the evidence offered at trial and the defense's comments upon it, we agree with the PCRA court that the issue lacks arguable merit. Indeed, this Court so held based upon comparable remarks in ***Commonwealth v. Brown***, 134 A.3d 1097 (Pa.Super. 2016). In that murder case, the appellant argued that the prosecution improperly speculated on witnesses' changing their stories when it suggested that they were afraid to identify the appellant in court. This Court rejected the argument as follows:

> [T]he record shows that [one witness] admitted his fear of cooperating with the police in his initial statement, indicating, "I'm sorry I didn't tell you guys everything the first time. I'm just scared. This is how people get killed and I don't want to be that guy." As such, we agree with the trial court that it was a fair inference to expect that [the witness in question and another witness], who lived in the same neighborhood as [the a]ppellant, would be concerned about the consequences of giving testimony in open court identifying [the a]ppellant as the shooter. Further, the prosecutor did not suggest that [the a]ppellant had threatened the witnesses but merely offered fear as a possible explanation for the witnesses' recantation of their original statements implicating [the a]ppellant in the shooting. As a result, no further review of this claim is warranted.

*Id*. at 1107 (citation omitted).

Here, as detailed above, the witnesses lived in Appellant's neighborhood, expressed fear for cooperating with police, and either recanted statements made outside of the courtroom or refused to appear to testify.

The Commonwealth likewise made no suggestion that Appellant had made any threats to the witnesses, but rather highlighted the general fear expressed by the witnesses to the effect that "snitches get stitches." Under **Brown**, such comments were a fair comment on the evidence. Accordingly, the PCRA court properly held that Appellant's claim that counsel was ineffective for failing to object to the closing arguments is meritless. No relief is due.

Appellant's second claim of error is that the PCRA court improperly declined to hold a hearing concerning recantation evidence relating to Mr. Johnson. Appellant's brief at 14. The essence of Appellant's argument is as follows: "In his Affidavit attached to Appellant's amended PCRA petition, [Mr.] Johnson averred that he did not see the murders, did not see Appellant in the vicinity of the murders, and relayed same by telephone to . . . Robert Dallas on the night of the murders." **Id**.

> The right to an evidentiary hearing on a post-conviction petition is not absolute. It is within the PCRA court's discretion to decline to hold a hearing if the petitioner's claim is patently frivolous and has no support either in the record or other evidence. It is the responsibility of the reviewing court on appeal to examine each issue raised in the PCRA petition in light of the record certified before it in order to determine if the PCRA court erred in its determination that there were no genuine issues of material fact in controversy and in denying relief without conducting an evidentiary hearing.

**Commonwealth v. Miller**, 102 A.3d 988, 992 (Pa.Super. 2014) (cleaned up).

The signed statement of Mr. Johnson from September 7, 2017, indicates that, on the day of the murders, he was speaking with Mr. Dallas on the telephone while walking down the street when he heard gunshots. Amended

- 11 -

PCRA Petition, 1/16/18, at Exhibit D. Mr. Dallas inquired about what had happened, and Mr. Johnson indicated that he did not know. *Id*. Mr. Johnson proceeded to see Biggs dead in the street, but did not see Appellant shoot anyone or even see him at the scene. *Id*. Mr. Johnson indicated that he spoke to the police, but they misconstrued what he said. *Id*.

Appellant also produced the affidavit and report of a private investigator who interviewed Mr. Dallas. PCRA Petition, 1/16/18, at Exhibit E. The report indicates that Mr. Dallas was a good friend of Mr. Johnson, and that Mr. Dallas spoke to Mr. Johnson on the day in question about attempting to "quash" troubles between some of Mr. Dallas's cousins and his friends who lived on Sheriden Street. *Id*. The call ended after Mr. Johnson informed Mr. Dallas that Biggs was exacerbating the situation by saying "someone's got to pay" for injuries Biggs had sustained during a robbery. *Id*. Ten minutes later, Mr. Dallas called Mr. Johnson again, and when gunshots were heard, Mr. Johnson indicated he was ducking behind a car. *Id*. Mr. Johnson then proceeded toward the area from which the shots rang out, and informed Mr. Dallas that there was no reason to "quash it anymore" because Biggs and another boy were shot. *Id*. Mr. Dallas informed the investigator that he believes that Mr. Johnson cooperated with the police to try to get lenity in an outstanding criminal case against Mr. Johnson, but Mr. Johnson later told him that he wanted to recant his statement and say he did not see the murders. *Id*.

In developing his claim, Appellant relies upon case law regarding counsel's duty to undertake a reasonable investigation in preparing for trial, including the duty to interview potential witnesses. Appellant's brief at 15 (citing, *inter alia*, **Commonwealth v. Basemore**, 744 A.2d 717, 735 (Pa. 2000)). He notes that it is his duty to show that:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Id*. at 17 (quoting **Commonwealth v. Washington**, 927 A.2d 586, 599 (Pa. 2007)). Further, "[t]o demonstrate prejudice where the allegation is the failure to interview a witness, the petitioner must show that there is a reasonable probability that the testimony the witness would have provided would have led to a different outcome at trial." **Commonwealth v. Pander**, 100 A.3d 626, 639 (Pa.Super. 2014) (*en banc*).

Appellant contends that the PCRA court erred in "summarily dismiss[ing]" his claim on the basis "that the jury believed [Mr.] Johnson's original statement to detectives and that [Mr.] Dallas'[s] prospective testimony would be hearsay . . . ." Appellant's brief at 20. Appellant maintains that a hearing was necessary to assess Mr. Johnson's "present and purported recantation" and Mr. Dallas's "statement regarding [Mr.] Johnson's admission on the night of the murders." *Id*. Appellant suggests that Mr. Johnson's

statement to Mr. Dallas was admissible, and that trial counsel should have called Mr. Dallas as a witness at trial. *Id*. at 20-21.

We cannot conclude that the PCRA court erred in dismissing Appellant's claim without a hearing. First, as discussed in connection with Appellant's first issue, the record clearly demonstrates that Mr. Johnson was not available to testify at Appellant's second trial. *See*, *e.g.*, *Commonwealth v. Cousar*, 154 A.3d 287, 313 (Pa. 2017) (holding claim was properly denied without a hearing where there was no indication that witnesses were prepared to cooperate and testify on behalf of the defendant).

Moreover, the testimony read into the record at the second trial due to Mr. Johnson's unavailability contained the same recantation that is offered in the new affidavit. The jury heard that Mr. Johnson denied having given the police the information contained in his statement, and that he professed having no knowledge that Appellant was involved in the murders. Yet, the jury found Appellant guilty. As such, there are no facts alleged which indicate that trial counsel rendered ineffective assistance regarding Mr. Johnson's testimony, let alone that the outcome of the trial would have been different if the jury heard his new recantation. Therefore, there was no reason for the trial court to hold an evidentiary hearing concerning Mr. Johnson's recantation affidavit. *See*, *e.g.*, *Commonwealth v. Jones*, 942 A.2d 903, 906 (Pa.Super. 2008) ("[I]f the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary.").

Second, Appellant has failed to demonstrate that his allegations concerning Mr. Dallas warranted a hearing. During trial, upon questioning from the trial judge, Appellant represented that he had not given trial counsel the names of any witnesses other than the ones already called at trial.[2] *See* N.T. Trial, 11/17/14, at 252. "A defendant who voluntarily waives the right to call witnesses during a colloquy cannot later claim ineffective assistance and purport that he was coerced by counsel." *Commonwealth v. Lawson*, 762 A.2d 753, 756 (Pa.Super. 2000). Appellant's claim that counsel should have called Mr. Dallas is meritless for that reason alone.

However, we also observe that the report from the investigator gives no indication that Mr. Dallas was available and willing to testify for the defense at Appellant's trial. Without any allegation that the witness was ready and willing to assist the defense, the claim was properly dismissed without a hearing.[3] *See Cousar*, *supra* at 313.

---

[2] Counsel clarified that he had discussed with Appellant the possibility of calling Appellant's sister, but they decided not to call her as a witness after interviewing her. N.T. Trial, 11/14/17, at 253.

[3] We note that, although Appellant supported other claims that counsel should have called other known witnesses by attaching correspondence evidencing counsel's knowledge, *see* PCRA Petition, 1/16/18, at Exhibits B and C (attaching correspondence reflecting counsel's knowledge of witnesses not relevant to this appeal), Appellant offered no such documentation to support his assertion that trial counsel was aware of the existence of Mr. Dallas through "correspondence between trial counsel and [Appellant]." *Id*. at Memorandum of Law (unnumbered page 7).

Moreover, given that the jury convicted Appellant despite every witness's in-court recantation and/or reluctance to cooperate, we cannot find that it is reasonably likely that the outcome of the trial would have been different had counsel interviewed Mr. Dallas. *See Lawson*, *supra* at 757 (affirming denial of claim of ineffective assistance in failing to present potential witness where there was "no evidence that the outcome would have been different had this testimony been heard in court").

Accordingly, the PCRA court did not err or abuse its discretion in dismissing Appellant's petition without holding a hearing on the issues presented by Mr. Johnson's redundant recantation or Mr. Dallas's purported corroboration of that recantation.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/18