J-S64031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M. A/K/A N.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1506 EDA 2018 |

Appeal from the Order Entered, April 26, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s):  CP-51-AP-0000295-2018,
CP-51-DP-0001450-2017, FIN: 51-FN-001340-2017.

| | | |
|---|---|---|
| IN THE INTEREST OF: M.V. A/K/A M.M.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1508 EDA 2018 |

Appeal from the Order Entered, April 26, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s):  CP-51-AP-0000296-2018,
CP-51-DP-0001451-2017, FIN: 51-FN-001340-2017.

J-S64031-18

IN THE INTEREST OF: J.M. A/K/A    :    IN THE SUPERIOR COURT OF
J.M.M., A MINOR    :    PENNSYLVANIA
       :
       :
       :
APPEAL OF: M.M., MOTHER    :
       :
       :
       :
       :
       :    No. 1509 EDA 2018

Appeal from the Order Entered, April 26, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s):  CP-51-AP-0000297-2018,
CP-51-DP-0001452-2017, FIN: 51-FN-001340-2017.


IN THE INTEREST OF: G.M. A/K/A    :    IN THE SUPERIOR COURT OF
G.B.M., A MINOR    :    PENNSYLVANIA
       :
       :
       :
APPEAL OF: M.M., MOTHER    :
       :
       :
       :
       :
       :    No. 1510 EDA 2018

Appeal from the Order Entered, April 26, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000298-2018,
CP-51-DP-0001453-2017, FIN: 51-FN-001340-2017.


BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:          Filed: January 2, 2019

- 2 -

M.M. (Mother) appeals the orders terminating her parental rights to her four children – daughters N.M. (age 7), M.V. (age 6), J.M. (age 5), and son G.M. (age 3) – pursuant to 23 Pa.C.S.A. §§ 2511(a)(2); (a)(5); and (b).[1] Mother also appeals the court's decision to change the goal of the dependency proceedings from reunification to adoption. We affirm the termination and the goal change.

The facts are these:

The children came to the attention of the Philadelphia Department of Human Services ("DHS") on May 31, 2017, when four-year-old J.M. was taken to the emergency room. She presented with extensive marks and bruises on her torso, pubic area, buttocks and thighs; the bruises were so severe that she received a full trauma evaluation. *See* Team Interview Summary, DHS Exhibit 4 from the Aggravated Circumstances hearing, dated 11/9/2017.[2] The totality of injuries revealed the presence of child abuse; the bruises on J.M's body were in various stages of healing, indicating that there were several incidents over time, and that the injuries were non-accidental.

_____

[1] The court also terminated the parental rights of the children's respective fathers. None appeal.

[2] At the conclusion of the termination hearing, the court incorporated into evidence, without objection, DHS Exhibits 1 – 13 from the Aggravated Circumstances Hearing, which occurred on November 9, 2017. We note that the recordkeeping in the file is quite poor. Exhibits were out of order and some were not clearly marked, making it difficult to distinguish which exhibits stem from the termination hearing and which from prior dependency hearings.

Mother claimed that J.M. incurred the bruises when her other daughter, seven-year-old N.M., gave J.M. a bath. *See* N.T., 4/26/18, at 38. G.M., the youngest, also presented with bruises on his torso, penis and upper thighs. He also had bite marks on his left ear, which had become infected. Mother claimed J.M. bit G.M. *Id.*, at 38. The forensic report revealed that DHS could not determine whether G.M. was nonverbal because of the trauma or because it was possible that he was on the autism spectrum. *See* DHS Exhibit 4, 11/9/2017.

The two older children, N.M and M.V., told investigators that all of the children were beaten by Mother's paramour. N.M. said that the children had to "kneel on rice and put their hands up in the air and take cold showers and if they moved they would get beat." *Id.* DHS observed that the children had bruises on each arm and imprints on their knees from the rice. *Id.* According to the summary, J.M. disclosed that the paramour spanked her with a belt and digitally penetrated her vagina. *Id.*

M.V. disclosed that Mother also beat her vagina with "a plastic belt, threw an orange and black car/truck at [M.V.] which caused [her] head to split open and [Mother] told M.V. if anyone asked what happened to say she fell off the bunk bed." *Id.* She also disclosed that Mother "wouldn't do anything" to prevent the paramour's beatings and sexual assault;[3] that Mother would

---

[3] DHS concluded that at least J.M. suffered a sexual assault. N.M. told interviewers that she knew the difference between a "good touch" and a "bad touch" and that the paramour did not touch her in a bad way. M.V. said she did not know the difference.

- 4 -

also hit the children and warned the children not to tell anyone or else they would be removed from her care. *Id.*

The children were removed by an Order of Protective Custody on June 2, 2017. Mother was subsequently arrested.

The children were adjudicated dependent on June 8, 2017, at which time the court made an additional finding that Mother was a "grave threat" and further ordered Mother not to have contact with the children. The court found "aggravated circumstances" on November 9, 2017. The court ordered a slew of evaluations. Mother was ordered to take a parenting evaluation and referred to a parenting and housing program. She was referred to a dual mental health and drug/alcohol evaluation and ordered to take drug screens.

She hardly complied with the services. Mother was discharged from a parenting program for non-attendance. Mother claimed she attended mental health services, but the provider said they had no record of Mother's participation. Mother's common refrain was either that she did attend – even though records indicated otherwise – or that she did not know she was supposed to. Often Mother attended the initial evaluation or program meeting, and then never again. Mother never complied with any drug screens, except for the one she was ordered to complete contemporaneously with the November permanency review hearing. There, she tested positive for cannabis. The trial court explicitly found Mother's testimony to be not credible.

In criminal court, Mother pleaded guilty to four counts of endangering the welfare of a child; two counts of conspiracy, and one count of obstruction of justice. In the weeks just prior to the April 2018 termination hearing, Mother was sentenced to a term of imprisonment 8 to 16 months and 5 years' probation; Mother testified that the term was actually 3 to 6 months plus the probation.[4] *See* N.T., at 44; 46.

The orphans' court held a termination hearing on April 26, 2018, where the children were properly represented by counsel, pursuant to 23 Pa.C.S.A. § 2313(a). On the same day, the trial court entered both the decree that terminated Mother's parental rights to all four children, as well as the permanency review order that changed the children's permanency goals to adoption. On May 18, 2018, Mother filed a notice of appeal, along with a concise statement of errors complained of on appeal, from the termination decree and the permanency review order.

Before we review the substantive issues presented by Mother on appeal, we observe the recent change in our law. In *Commonwealth v. Walker,* ___ Pa. ___, 185 A.3d 969 (2018), our Supreme Court recently held:

> [I]n *future* cases Rule 341(a) will, in accordance with its Official Note, require that when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed. The failure to do so will result in quashal of the appeal.

---

[4] Mother likely was including the time already served, but the record is not clear.

*Id.*, at 977 (emphasis added)(footnote omitted).

Here, the decrees and orders from which Mother appeals were listed on separate dockets in the trial court: the adoption docket (involving the termination matter), and the dependency docket (involving goal change matter). While Mother properly filed separate notices for each child, she did not file separate notices for each docket.[5] Because Mother filed her notices two weeks *prior* to *Walker*, however, we need not quash the appeal.

Mother filed this timely appeal, and she presents three issues for our review:

> 1. Did the trial judge rule in error that [DHS] [met] its burden of proof that Mother's parental rights to her children should be terminated.
>
> 2. Did the trial judge rule in error that the termination of [Mother's] parental rights would best serve the needs and welfare of the children.
>
> 3. Did the trial judge rule in error that [DHS] [met] its burden of proof that the goal be changed to adoption.

Mother's Brief, at 5.

We review Mother's issues mindful of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial

---

[5] Mother filed separate notices of appeal for each child, at 1506, 1508, 1509, and 1510 EDA 2018, which we have consolidated.

> court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted).

Notwithstanding its vagueness, we glean from Mother's Brief that her first issue relates to the trial court's § 2511(a) analysis. Mother concedes that she has not made progress on her reunification goals, but argues that the ordered compliance was tantamount to a violation of her Fifth Amendment right against self-incrimination. **See** Mother's Brief, at 6, 7-9; **see also** U.S. Const. Amend. 5. [6, 7] For instance, she contends that she could not begin the SAGE parenting program without first admitting her involvement in the children's abuse. **See** Mother's Brief, at 7. Thus, Mother would have had to either self-incriminate or deny responsibility and suffer the consequences of that denial in dependency court.

The argument is novel, but not one properly preserved for our review. Issues not raised in the lower court are waived and cannot be raised for the

---

[6] "No person…shall be compelled in any criminal case to be a witness against himself…."

[7] The privilege of self-incrimination in the Pennsylvania Constitution tracks the protection afforded under the Fifth Amendment. **See Commonwealth v. Becker**, 192 A.3d 106 (Pa. Super. 2018).

first time on appeal. *See* Pa.R.A.P. 302(a). We have interpreted Pa.R.A.P. 302(a) to mean that in order for an issue to be appealable, it must be both "raised" and "preserved" in the trial court:

> In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction…one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

*In re S.C.B.*, 990 A.2d 762, 767 (Pa. Super. 2010) (finding waiver when Mother failed to raise an objection at the termination of parental rights hearing) (quoting *Thompson v. Thompson*, 963 A.2d 474, 475-476 (Pa. Super. 2008) (citation omitted). Even constitutional issues may be waived. *See, e.g., Milicic v. Basketball Mktg. Co., Inc.,* 857 A.2d 689 (Pa. Super. 2004).

As far as we can discern, Mother never objected or otherwise tried to assert her Fifth Amendment right as a defense to her noncompliance until her counsel mentioned it in passing during the closing arguments of the termination hearing. *See* N.T., at 57.[8] Mother's first issue is waived.

_____

[8] Although we find waiver in this instance, we would be remiss not to point out the inconsistency between Mother's argument and her testimony. Mother's

- 9 -

We turn now to Mother's second issue, that the court erred in finding that termination was warranted under § 2511(b). Termination of parent rights requires a bifurcated analysis. If the court determines that the parent's conduct warrants termination under § 2511(a), only then does the court engage in the second part of the analysis pursuant to § 2511(b):

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. […].

23 Pa.C.S.A. §2511(b); *see also In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017).

Before granting a petition to terminate under § 2511(b) a court must:

> [C]arefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the children's needs and welfare, **must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.**

_____

testimony was **not** that the court's reunification plan placed her in an unconstitutional catch-22, where she was forced to choose between her right to parent her children and her right against self-incrimination. Instead her actual position at the termination hearing was that she was unaware of her obligations under the reunification plan. **See** N.T., at 51. ("I don't know what SAGE parenting program is."; "I didn't know I had an evaluation in December."; and "I didn't know I was scheduled for [random drug screens].")

- 10 -

***In re Adoption of G.L.L.*** 124 A.3d 344, 347 (Pa. Super. 2015) (quoting ***In re K.J.,*** 936 A.2d 1128, 1134 (Pa. Super. 2007)) (emphasis original).

Instantly, the trial court found no positive or healthy bond between Mother and the children. Mother's testimony reveals that she is still in denial:

> To be honest with you, I think [my relationship with the children] is good, to be honest, I never intentionally meant to hit my kids or anything. I may have spanked them or I sat and popped them in the hand once or twice when they do wrong, but I was only being a mother making sure they didn't do wrong by anything that they was doing.
>
> Now as far as loving them unconditionally, yes, I do love my kids unconditionally. I'll do anything for my kids, never once harmed them, never picked up an object to harm them anything in that manner.

N.T., at 42-43.

Mother further testified that she was unaware that her paramour made the children kneel on rice, or that J.M. ever needed to be rushed to the hospital. ***Id.***, at 47. She claimed that she properly cared for G.M.'s infected ear bites. ***Id.***, at 48. The court did not believe Mother's account of the abuse. The court noted further the service provider's testimony that the children were so afraid of Mother that they did not want to leave their caregiver's home for fear of coming in contact with her. ***See*** N.T., at 25. The three older children did not even ask about Mother. ***Id.***, at 35. Since their placement, the children's behaviors improved dramatically. All of the children have "done a complete 180" since moving in with their pre-adoptive foster parent, who is a kinship placement. ***Id.***, at 27. They no longer need certain rehabilitative

services. They have responded well to therapy. G.M. is no longer malnourished. The children are "flourishing." *Id.*, at 26. The court found that termination best serves the children's needs and welfare. We discern no abuse of discretion in this regard.

We turn now to Mother's final contention that the court abused its discretion by changing Child's permanency goal to adoption. We apply the following standard of review.

> …[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's interferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

The Juvenile Act governs proceedings to change a child's permanency goal. *See* 42 Pa.C.S.A. §§ 6301 – 6375. Trial courts must apply the following analysis when considering a goal change petition.

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety. […]
>
> The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court held, a child's life simply cannot be put on hold in the hope that the parent

will summon the ability to handle the responsibilities of parenting.

***In re A.B.***, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011) (citations and quotation marks omitted).

For all of the reasons previously stated, reunification was no longer a realistic goal. The children were still in need of parental care as Mother failed to substantially comply with her reunification objectives at all points during the dependency proceedings. Their current placement has allowed the children to live in a safe and stable environment for the first time, and they are thriving. Mother will likely never be able to remedy the conditions which led to the children's placement, and she certainly cannot do so in a reasonable amount of time. As such, adoption is the only way for the children to achieve safety and permanency as envisioned by both the Juvenile Act and the Adoption and Safe Families Act (ASFA), 2 U.S.C. §671 *et. seq.*

Orders of termination and goal change affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 1/2/2019*

- 13 -