J-S27044-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HECTOR LUIS GONZALEZ | : | |
| | : | |
| Appellant | : | No. 2782 EDA 2019 |

Appeal from the PCRA Order Entered August 28, 2019
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0005117-2013

BEFORE: SHOGAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JUNE 22, 2020**

Appellant Hector Luis Gonzalez appeals from the Order entered in the Court of Common Pleas of Lehigh County on August 28, 2019, denying his first petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1] We affirm.

A previous panel of this Court reiterated the trial court's summary of the relevant facts herein as follows:

On September 28, 2013, at approximately 11:30 p.m., Francisca Olivo heard banging sounds and people running from the apartment above hers at [address omitted]. She then heard a knock at her door and someone asking for help in Spanish. Ms. Olivo opened the door and discovered a bleeding man standing in her front porch area. Ms. Olivo noted that the individual seemed pale and weak and she sat the man on a chair on the porch. Ms. Olivo directed someone else within her apartment to call 9-1-1.

_____

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

Ms. Olivo's sister-in-law, Wanda Mendez, began to apply pressure to the man's wounds which were on his chest, leg and arm.

Shortly thereafter, members of the Allentown Police Department responded to [address omitted] for a report of a stabbing. Officer Craig Berger was the first officer on scene and observed the victim, later identified as Ahiezer Padilla-Marrero, slumped over on a chair to the left of Ms. Olivo's front door, surrounded by a group of people. Officer Berger observed that [the victim] had an apparent stab wound to the center of his torso, was covered in blood, and was non-responsive. He radioed EMS and directed them to come to the scene immediately.

At that point, Officer Michael Yetter had arrived on scene and stayed with the victim and witnesses. Officer Berger proceeded to the front apartment building door and observed blood droplets on the steps, leading into the building. He followed those blood droplets to Apartment D3. At that point, Officer Kyle Pammer joined him and they determined that the apartment door was locked. The officers knocked on the door, paused for 20 seconds, knocked again on the door, and announced their presence as police officers. Officer Berger radioed the police sergeant and advised that he and Officer Pammer were going to enter the apartment. Sergeant Alicia Conjour, now positioned outside of the apartment building, advised that she observed a male appear in a window of the apartment.

When no response was made from the inside of the apartment, Officer Berger delivered one kick to the door and was able to enter the apartment with Officer Pammer. Upon entering the apartment, they observed that the apartment was in disarray and noted a dining room and kitchen off to their right. They observed a kitchen to the right of the dining room. As they cleared the area, they observed blood on the carpet, walls, furniture and kitchen sink area. Inside the sink, Officer Pammer observed three or four knives which were wet, and blood in the sink. After clearing the kitchen living areas, the officers heard footsteps and heard a door close.

The officers noticed two doors to the rear of the apartment. The left door was open and Officer Berger was able to determine that the door led to a bathroom. The door to the right was closed. Officer [David] Howells, now present in the apartment, announced that whoever was inside should come out. Approximately 10 to 15 seconds later, a male emerged, wearing only blue jeans or shorts. The man had blood spatter on his face and chest area and kept looking back into the room, which was ultimately determined to be the only bedroom in the apartment. The male appeared

hesitant and kept looking back into the room, causing other officers to train their Taser guns on the male. Ultimately, Officer Berger handcuffed him. The male was identified as [Appellant]. The officers discovered [Appellant's] two minor children inside the bedroom.

Once handcuffed, [Appellant] was led to the kitchen area and was seated at the dining room table. Officer Berger noted injuries to his head and blood on his torso. He contacted EMS to respond to the apartment to treat [Appellant]. Officer Berger then obtained basic information from the male, including his name and date of birth, and kept him under observation. Officer Berger also observed blood spatter and a dent in the drywall in the dining area. While seated at the table, [Appellant] began to talk to Officer Berger, despite not being asked any questions by the officers on scene. Speaking in "broken" English, [Appellant] related that the victim had eaten all of the food [Appellant] had previously prepared for his children and that [Appellant] felt disrespected. [Appellant] confronted the victim and the victim punched [Appellant] in the face. The victim grabbed a knife and [Appellant] responded by grabbing a knife himself. He then repeatedly asked Officer Berger, "What would you do?" Officer Berger did not answer [Appellant], nor did he ask him any questions.

When EMS arrived, Officer Berger asked them to check [Appellant] for injury or if he was in need of medical treatment. [Appellant] refused medical treatment.

Detective Raymond Ferraro had arrived on scene and began to speak with [Appellant], again obtaining basic information. He was able to observe blood splatter on [Appellant] and that there was an injury near [Gonzalez's] eye. Detective Ferraro, unable to speak Spanish, believed that there may be a language barrier and requested that Officer Miguel Villa respond to the scene to assist in translation. Officer Villa is bilingual in Spanish and English. Detective Ferraro, Officer Villa, and [Appellant] were seated at the kitchen table and Officer Villa advised [Appellant] of his *Miranda*[2] warnings in Spanish, after Detective Ferraro read them aloud in English. [Appellant] verbally acknowledged that he understood his rights and was also given a written *Miranda* warning form to read, which was written in both English and Spanish. [Appellant] read the form and signed it with his right hand, acknowledging that he understood his rights, in Officer

_____

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Villa's presence. [Appellant] appeared sober and responded in both English and Spanish to questions posed to him. At that point, Detective Ferraro was treating the incident as a stabbing investigation and [Appellant] was taken to police headquarters.

At some later point in time, Detective Ferraro was informed that the victim had succumbed to his injuries. At that point, Detective Ferraro requested the assistance of Lehigh County Detective Joseph Vazquez, a member of the Homicide Task Force. Detective Vazquez went to the scene, made observations, and proceeded to police headquarters.

At headquarters, a videotaped interview with [Appellant] was conducted. [Appellant] was informed that Detective Vazquez spoke Spanish and was available to translate during the interview. [Appellant] was again ***Mirandized,*** and he again completed the written waiver of his rights. The detectives first obtained biographical information from [Appellant] and advised him that they wanted to speak to [Appellant] regarding what had transpired in the apartment. Thereafter, the detectives advised [Appellant] that the victim had died. [Appellant] immediately began to cry.

During the course of the interview, [Appellant] changed his story several times. First, he indicated that he did not know what happened. Next, he stated that the victim had stabbed himself. Then, [Appellant] indicated that indeed he and the victim had fought, but that if the victim had been stabbed, [Appellant] didn't remember stabbing him. Finally, after Detective Ferraro disclosed that the victim had suffered a stab wound to the back, [Appellant] once again indicated that he did not know what had happened.

The detectives presented [Appellant] with several scenarios of what may have happened, including one in which [Appellant] was acting in self-defense, but [Appellant] refused to agree with any of the scenarios posed by the detectives. [Appellant] denied stabbing the victim.

On September 30, 2013, an autopsy was performed by Dr. Barbara Bollinger, a forensic pathologist and expert in forensic pathology. Dr. Bollinger determined that the victim's cause of death was multiple sharp force injuries and the manner of death was homicide. Specifically, Dr. Bollinger found a large, gaping stab wound to the victim's chest approximately 2.5 to 3.5 inches in depth, which had plunged into the victim's heart. Dr. Bollinger opined that this was a lethal wound and the victim would have succumbed to the wound within minutes. Further, she found a stab wound to the right aspect of the victim's neck, which had perforated the small internal jugular vein. She opined that this

was another fatal stab wound. Dr. Bollinger testified that the wounds were consistent with the use of two different knives.

Dr. Bollinger found several other superficial wounds on the victim's torso, back, shoulders, back of wrists, forearms, left thigh and knee. She further opined that some of these wounds could be categorized as defensive wounds.

[Appellant] testified at trial, telling the jury that he and the victim were family friends and that he had known the victim while the two of them lived in Puerto Rico. He stated that approximately one and a half weeks before this incident, he had permitted the victim to stay in his apartment, so long as the victim agreed to follow [Appellant's] house rules. Specifically, [Appellant] wanted the apartment to remain clean and for the victim to refrain from using [Appellant's] personal hygiene items. While staying at [Appellant's] apartment, the victim slept on a mattress in the living room area.

On September 28, 2013, [Appellant] had returned in the late evening with his children, ages 2 years and 1 year old. The victim was at the apartment when they arrived home. [Appellant] and children greeted the victim and [Appellant] proceeded to bathe his children and attempted to feed them. [Appellant] testified that earlier in the day, he had made rice for the children. When [Appellant] checked the pot still on the stove, he discovered that there was not enough for the children to eat.

[Appellant] confronted the victim regarding the missing food and the two began to argue. Their verbal argument got louder and one of the young children appeared to be scared. [Appellant] testified that he asked the victim to lower his voice and that if he couldn't calm down, that he should go outside of the apartment to cool down. [Appellant] began to take his children into the bedroom.

[Appellant] further testified that just before he entered the bedroom with his children, the victim punched him in the head, causing [Appellant] to strike the child he was carrying. [Appellant] put the children in the bedroom and reemerged. [Appellant] stated that he pushed the victim and told him that he didn't want him at his house anymore because [Appellant] had been disrespected. As the victim was walking backwards out of the bedroom area, [Appellant] began to punch the victim.

The physical altercation continued as the victim walked into the dining room area. [Appellant] testified that the victim pushed him into a wall, causing him to fall down. [Appellant] was able to get up and the fight continued in the corner of the dining room. [Appellant] testified that the victim then entered the kitchen,

opened a drawer, and retrieved a knife. [Appellant] testified that he told the victim to calm down and to leave the apartment. [Appellant] further testified that the victim stated that he wanted to continue the fight and brandished a knife. [Appellant] attempted to grab the victim's hand in order to take away the knife. He was unsuccessful and the fight continued. At some point, the knife fell onto the ground and the victim grabbed [Appellant] by his neck and threw him to the floor. [Appellant] testified that he was throwing punches and kicking at the victim when he felt something on the floor. [Appellant] then struck the victim with the knife, attempting to get the victim to stop fighting and/or choking him. [Appellant] characterized his knife use as a "poke," intended only to force the victim to let go of him. [Appellant] continued to "poke" at the victim.

A short time later, [Appellant] realized that he had blood on him and went to his children to calm them. He then saw the victim leaving the apartment, went to the apartment door to lock it, and noticed blood on the doorknob. [Appellant] then went into the bathroom and washed his hands. He also discovered the bleeding wound over his eye.

On cross examination, [Appellant] admitted that he had a confrontation with the victim and that he caused the victim's death. He further admitted that he did not inform the police that the victim punched him first to start the altercation, nor did he inform them that the victim choked him in the course of the fight. [Appellant] believed that the victim's stab wounds must have occurred in the course of their altercation and denied deliberately stabbing the victim.[5]

_____

[5] [Appellant] also presented the prior criminal record of the victim, showing that the victim had three simple assault convictions, in 2005 (12 months' probation), 2010 (12 months' probation), and 2011 (7-23 months' imprisonment). *See* N.T., 10/2/2014, at 127-135. It was stipulated that [Appellant] was convicted of simple assault in 2013, and received 12 months' probation. *Id.* at 137.

***Commonwealth v. Gonzalez***, No. 3435 EDA 2014, 2016 WL 5799130, at *2–5 (Pa.Super. Aug. 16, 2016) *citing* Trial Court Opinion, 3/16/2015, at 3-9.

The jury found Appellant guilty of Third Degree Murder, and the trial court sentenced him to twenty (20) to forty (40) years in prison. This Court affirmed Appellant's judgment of sentence on August 16, 2016, in an unpublished memorandum decision. ***See***, ***supra***. The Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on February 14, 2018. ***Commonwealth v. Gonzalez***, 645 Pa. 564, 181 A.3d 1077 (Table).

On February 11, 2019, Appellant timely filed the instant PCRA petition wherein he raised numerous claims of trial counsel's ineffectiveness. Specifically, Appellant stated he and trial counsel had met only sporadically prior to trial and that trial counsel failed to prepare him to testify adequately at trial. Appellant further posited that counsel failed to obtain an expert witness to testify as to the weapons utilized at the time of the altercation, which testimony could have bolstered his heat of passion/self-defense claims.

Following a hearing on May 31, 2019, the PCRA court dismissed Appellant's petition on August 28, 2019. Appellant timely appealed, and on October 3, 2019, the PCRA court ordered Appellant to file a concise statement of the matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied, and the trial court filed its Rule 1925(a) Opinion on October 28, 2019, wherein it indicated that its previously-filed August 28, 2019, Opinion adequately addressed the issues Appellant raised on appeal.

In his appellate brief, Appellant presents the following question for this Court's review: "Whether Trial Court determination is supported by the

evidence of record and whether it is free of legal error?" Brief for Appellant at 1.[3]

Appellant argues trial counsel's own testimony at the PCRA hearing that Appellant "surprised" him by testifying to matters the two had not discussed, coupled with the conflicting recollections between trial counsel and Appellant regarding the number of times the two had met without an interpreter present, illustrates counsel's ineffectiveness. Brief for Appellant at 7-8. In addition, Appellant asserts counsel's failure to secure an expert witness pertaining to the number of knives used in the incident deprived Appellant of possible impeachment evidence and may have led to a heat of passion or imperfect self-defense theory. *Id*. at 9-11.

We begin with a review of the applicable law: "This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error." ***Commonwealth v. Rizvi***, 166 A.3d 344, 347 (Pa.Super. 2017) (citation omitted). Further, "[i]t is an appellant's burden to persuade

_____

[3] We note Appellant's brief is in violation of Pa.R.A.P. 2119(a), which provides that "[t]he argument shall be divided into as many parts as there are questions to be argued." Appellant presents just one question for our review, yet his brief is divided into two subparts wherein he essentially presents three separate claims of ineffective assistance of counsel.

us that the PCRA court erred and that relief is due." ***Commonwealth v. Miner***, 44 A.3d 684, 688 (Pa.Super. 2012).

"The law presumes counsel has rendered effective assistance." ***Commonwealth v. Postie***, 200 A.3d 1015, 1022 (Pa.Super. 2018) (*en banc*) (citation omitted); we consider Appellant's claims of counsel's ineffectiveness mindful of this fact and aware that a PCRA petitioner bears the burden of proving otherwise. ***Commonwealth v. Becker***, 192 A.3d 106, 112 (Pa.Super. 2018). To do so, the petitioner must plead and prove (1) the legal claim underlying his ineffectiveness claim has arguable merit; (2) counsel's decision to act (or not) lacked a reasonable basis designed to effectuate the petitioner's interests; and (3) prejudice resulted. ***Id***. The failure to establish any prong is fatal to the claim. ***Id***. at 113.

In disposing of Appellant's contentions that trial counsel's allegedly sporadic pre-trial visits without an interpreter failed to prepare him for cross-examination, the trial court observed the following:

*Defense Preparation and Communication*

Attorney Baurkot has been employed by the Lehigh County Public Defender's Office for 32 ½ years working exclusively in criminal defense. He was appointed for this homicide and had the assistance of another public defender. Attorney Baurkot testified that he met with [Appellant] to go over, "every phase of the case and trial." Attorney Baurkot did not recall any issue with communication. They discussed [Appellant's] trial testimony "a number of times" before trial. Counsel estimated that he met with [Appellant] between fifteen to twenty times. Attorney Baurkot refuted the allegations of phone contact because he would almost never talk to a client about his case on the recorded prison telephone or in the presence of his counselor. The case was

reviewed in sufficient detail by addressing the strengths, the weaknesses, and the pros and cons of pleading. Attorney Baurkot testified a main issue was that [Appellant] wanted a plea to voluntary manslaughter in a potential first-degree homicide case. [Appellant] would not accept a plea to third degree murder.

The Commonwealth cites *Commonwealth v. Johnson*. In Johnson, the [a]ppellant alleged that his trial counsel had only met with him the night before his trial. In denying PCRA relief, the Superior Court noted, "[w]hile we acknowledge that more contact may have been advisable, we disagree with the [a]ppellant that the length and frequency of the consultations alone can support a finding of ineffectiveness." *Com. v. Johnson*, 51 A.3d 237, 244 (Pa.Super. 2012). Similar to *Johnson*, the parties had ample opportunity to prepare for trial. Ineffectiveness of counsel does not necessarily derive from the frequency or length of defense contact. The exact number of meetings or discussions becomes immaterial compared to whether defense counsel's contact permitted a presentation of a cogent trial strategy. *See Com v. Johnson*, 2012 PA Super 168, 51 A.3d 237, 244 (2012).

Here, Trial Counsel participated in all aspects of the [Appellant's] case including his preliminary hearing. A review of the record would reveal that the defense put forth considerable effort in presenting a defense including pretrial efforts. [Appellant] had almost a year to prepare for the case before trial. Trial Counsel presented a cogent strategy of self-defense. Although the strategy was unsuccessful at obtaining complete acquittal, the [Appellant] avoided a conviction for murder of the first degree. [Appellant] was spared a life sentence through the diligent work of his defense team. Based on the foregoing, we find that [Appellant] has failed to meet his burden under the *Strickland/Pierce*[4] standard.

[Appellant] further asserts that there was an issue regarding his ability to communicate. As pointed out by the Commonwealth,

---

[4] *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987) (setting the now well-established precedent that to establish trial counsel's ineffectiveness, a petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for the course of action or inaction chosen; and (3) counsel's action or inaction prejudiced the petitioner).

it is significant that [Appellant] does not state with any specificity what was not communicated or how that impacted the case. ***See Com v. Jones***, 815 A2d 598, 612 (Pa. 2002) (Boilerplate assertions are inadequate to meet the affirmative burden to rebut the presumption that lawyers are competent and effective).

Here, Trial Counsel represented [Appellant] throughout all proceedings. [Appellant] speaks English but contends that he would have preferred to have an interpreter to aid his comprehension. In court proceedings, [Appellant] was provided with an interpreter and held discussions with the [c]ourt. [Appellant] spoke to Trial Counsel almost exclusively in English without a problem. Throughout the course of the proceedings, which occurred for almost a year, [Appellant] never raised an issue about communication with his lawyer or the [c]ourt. Thus, we find this contention contrary to the record.

Regardless of any alleged deficiencies, we have difficulty finding prejudice as [Appellant] raised his claim of self-defense. The Commonwealth's evidence overwhelmingly negated such a claim. Therefore, we presume Trial Counsel was effective and find no merit to these allegations.

Trial Court Opinion, filed 8/28/19, at 7-10 (citations to notes of testimony omitted). Following our independent review of the record, we find no legal error in the PCRA court's reasoning, and consequently, Appellant's first claim lacks merit.

Appellant next asserts he was prejudiced by trial counsels' failure to call an expert witness to testify regarding the number of knives used in the attack. The decision as to whether to call witnesses involves matters of trial strategy. ***Commonwealth v. Poindexter***, 646 A.2d 1211, 1216-1217 (Pa.Super. 1994). Importantly, in order to satisfy a claim of ineffectiveness based upon trial counsel's failure to call an expert witness, Appellant must prove that an expert witness was willing and available to testify on the subject at trial, that counsel knew or should have known about the witness, and that he was

prejudiced by the absence of the testimony. **See Commonwealth v. Chmiel**, 30 A.3d 1111, 1143 (Pa. 2011). Additionally, we note that this Court may affirm the decision of the lower court on any proper ground that is supported by the record. **See Commonwealth v. Judge**, 916 A.2d 511, 517 n.11 (Pa. 2007).

The trial court found that Appellant had failed to overcome his difficult burden of showing there was no reasonable basis for trial counsel's strategy. The court cites to counsel's testimony at the PCRA hearing that he consulted with an expert in forensic pathology in preparation for trial. After discussing the victim's injuries, counsel determined the dispute regarding multiple knives was not significant to warrant the expert's testimony; the expert informed counsel he could not provide any benefit to Appellant because he thought his case might be a first-degree murder matter. Trial Court Opinion, 8/28/19, at 11.

However, a review of the record herein reveals that Appellant never has tendered the existence or availability of an actual expert on the "number of murder weapons used." **See** Brief for Appellant at 9. As a result, he also has been unable to articulate, other than hypothetically, what testimony would have been available to him at trial had his attorney acquired such a witness:

> If an expert was retained and they [sic] opined that only one knife was used during the incident, this could have led to key grounds of impeachment during the [t]rial. This testimony could have led to possible defenses of heat of passion or imperfect self-defense. At this current juncture it is not known if such an expert could have been retained nor if their testimony would have been helpful

for the defense, but the sheer absence of any attempt to find such expert is ineffective for such a critical issue in a murder case.

*Id*. at 10.

This failure to support his allegations with any substantive evidence undermines Appellant's claim, for it is not sufficient for Appellant to claim an expert would have been beneficial at trial without setting for the identity and prospective testimony of that witness. ***See Commonwealth v. Wayne***, 720 A.2d at 456, 470-71 (Pa. 1998) ("The mere failure to obtain an expert rebuttal witness is not ineffectiveness. Appellant must demonstrate that an expert witness was available who would have offered testimony designed to advance appellant's cause.").

Accordingly, Appellant's claim fails, for he has neglected even to identify the proposed witness or demonstrate availability, let alone establish prejudice. In light of all of the foregoing, Appellant's PCRA petition does not entitle him to relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/20

- 13 -