J-S01045-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JULIO ANGEL ORTIZ-LUGO | : | |
| | : | |
| Appellant | : | No. 900 MDA 2020 |

Appeal from the PCRA Order Entered June 16, 2020
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0000797-2014

BEFORE:   LAZARUS, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JANUARY 29, 2021**

Appellant Julio Angel Ortiz-Lugo appeals from the Order entered in the Court of Common Pleas of Berks County on June 16, 2020, denying his first petition filed pursuant to the Post Conviction Relief Act (PCRA).[1]  We affirm.

This Court previously set forth the relevant facts and procedural history on direct appeal as follows:

> . . .  [Appellant] was sentenced to serve a term of life imprisonment for first degree murder, was concurrently sentenced to a term of life imprisonment for second degree murder, and concurrently sentenced to a term of one to five years for possession of instruments of crime.[1] Appellant received credit for 488 days time served. He was also ordered to pay costs of $8,139.75.
> On November 16, 2013, Aida Flores ("Flores"), the lessee of 504 Minor Street in the City of Reading, Pennsylvania, hosted a number of people. Her son Brandon Troncoso ("Troncoso"); and daughter, Nayaliz Flores; her boyfriend, appellant; Lizmar Torres

---

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

("Torres"); and Juan Carlos Lopez Bonilla ("Bonilla"). That day, Flores and appellant had a disagreement. Flores told appellant to leave. (Notes of testimony, 3/16–18/15 at 114–115.) That evening, Flores invited her nephew, Jaxel Flores, over to have pizza and spend the night. (*Id.* at 122.)

At approximately 10:00 or 11:00 p.m., Flores left her house to meet her godmother and have a few drinks. When she returned home at approximately 3:00 a.m., only Torres and Bonilla were awake. Torres prepared some food and then went upstairs to her bedroom where her children were sleeping. Torres then fell asleep herself. (*Id.* at 121–123.)

Later, Troncoso woke up Torres, by screaming, "Dundy, what are you doing here?"[2] (*Id.* at 123.) Apparently, appellant entered the house by breaking and entering through a bathroom window. Appellant grabbed Torres' phone and ran downstairs. Troncoso followed him. After checking on the safety of her daughter, Torres went downstairs. She saw a bloody Bonilla on the sofa asking for help. Appellant was no longer in the house, and the front door was open. (*Id.* at 127–129.) The police were summoned. Bonilla soon died. The police interviewed Flores, and she admitted that appellant was her ex-boyfriend. The videotape of this interview was subsequently played at appellant's trial. (*Id.* at 150.)

Appellant was arrested and charged with first, second, and third-degree murder, burglary, two counts of aggravated assault, and possession of the instruments of a crime.

Appellant's trial commenced on December 4, 2014. Torres testified that she came to live with Flores after she was evicted and that she lived on the third floor of the house. (*Id.* at 80.) Torres testified that at around 3:00 or 4:00 a.m. on November 17, 2013, she got up to get milk for her child. She saw appellant and Bonilla fighting in the living room. She did not see any weapons but noticed that there was blood on Bonilla's sweatshirt, appellant's sweatshirt, and appellant's left hand. (*Id.* at 82–84 .) The Commonwealth introduced a videotape of Torres' interview with the Reading Police on November 17, 2013, in which she stated that appellant had a knife which she described and demonstrated a stabbing motion. (*Id.* at 95.)

Jaxel Flores testified that he was at Flores' house on the night of the killing. He went to bed at between 2:00 to 3:00 a.m. (*Id.* at 36, 39.) He was awakened sometime later when he heard glass breaking. He then heard Torres screaming, "Dundy, no, don't do it." (*Id.* at 40–41.)

Troncoso, who was 12 years old at the time of trial, testified that Bonilla stayed at his house for about three or four days because he was a friend of appellant's. Appellant left the house that day because he and Flores were fighting. (*Id.* at 53.) That night, Troncoso went to bed in his mother's room at approximately 1:30 or 2:00 a.m. He, his sister, and his mother were sleeping in that room. He woke up when he heard glass breaking in the bathroom. Troncoso then saw appellant running downstairs after appellant took Flores' phone. (*Id.* at 55.) Troncoso went downstairs and saw Bonilla with "blood all over the couch, on him, on his head, his hair." (*Id.* at 58.) Troncoso saw appellant leave and throw a knife down a drain outside. (*Id.* at 58.) In the midst of cross-examination, Troncoso stated, "I want to go. I don't want to be here no [sic] more." (*Id.* at 67.) After a brief recess, Troncoso continued with his father, Anthony Troncoso, standing behind him while he was on the witness stand. (*Id.* at 73.) Troncoso admitted that when he was interviewed by the police, he did not mention a knife. (*Id.* at 76.)

Officer Charles Federico ("Officer Federico") of the Reading Police Department testified that he responded to the call for a stabbing at Flores' residence. When he arrived, Officer Federico saw blood on the front door, Bonilla lying in a pool of blood, and two adults and five children. Troncoso told Officer Federico that Bonilla was the victim and that his "mom's ex-boyfriend [appellant]" stabbed him. (*Id.* at 154–156.) Torres told Officer Federico that appellant and Bonilla had an argument and "he [appellant] pulled out a knife and began to stab him." (*Id.* at 158.) Other testimony included evidence that blood samples in the bathroom window, hallway, entrance way at Flores' house, and along the sidewalk along the front door of the house were tested for DNA which indicated that the blood belonged to appellant. (*Id.* at 230–237.) Neil Hoffman, M.D. ("Dr.Hoffman"), a forensic pathologist, testified that Bonilla's death was caused by a penetrating stab wound that penetrated between the fifth and sixth ribs and into the pericardial sac and the left ventricle of the heart. (*Id.* at 247–249.) On cross-examination, Dr. Hoffman also testified that the wounds occurred during the course of a struggle. (*Id.* at 261–262.)

On March 18, 2015, the jury found appellant guilty of all charges. On April 29, 2015, the trial court issued its sentence.

On May 8, 2015, appellant filed a post-sentence motion and sought a new trial and/or arrest of judgment and/or judgment of acquittal. Appellant alleged the following:

1. The verdicts are contrary to law.

2. The verdicts are contrary to the evidence.

3. The verdicts are contrary to the weight of the evidence.

4. The evidence was insufficient to sustain the verdicts of guilty.

5. The verdict of guilty to all counts of the information is contrary to the law, the evidence, the weight of the evidence, and the evidence is insufficient to sustain a verdict of guilty, and defendant is otherwise entitled to appropriate legal relief, for the following reasons:

> (a) [Appellant] avers that given the equivocal and contradictory nature of the testimony of the witnesses presented by the Commonwealth, unsupported or corroborated by forensic evidence that the verdicts as to the homicide/assault are against the weight of the evidence.

> (b) The Commonwealth lacked sufficient admissible, reliable and credible evidence of identification that showed [Appellant] was in fact the perpetrator.

> (c) [Appellant] avers that the weight of the evidence may have established burglary and theft charges and thus his presence at the scene. However, the evidence as to his involvement in the homicide/assault was undercut where [,] although [Appellant's] blood was all over the house [,] none was apparently present on or about the body of the deceased.

Appellant's post-sentence motion, 5/8/15 ¶¶ 1–5 at 1–2.

By order dated May 14, 2015, the trial court denied the motion.

_____
[1] 18 Pa.C.S.A. § 2502(A), 18 Pa.C.S.A. § 2502(B), and 18 Pa.C.S.A. § 907 respectively.

***Commonwealth v. Ortiz-Lugo***, 2016 WL 1292858, at *1–3 (Pa.Super. Apr. 1, 2016) (unpublished memorandum).

After finding Appellant had waived the three issues he presented, this Court affirmed Appellant's judgment of sentence on direct appeal. *Id*. at *4. The Pennsylvania Supreme Court denied Appellant's Petition for Allowance of Appeal on August 23, 2016. *See Commonwealth v. Ortiz-Lugo*, 636 Pa. 674 (2016).

On December 13, 2016, Appellant timely filed a PCRA petition*, pro se*. Counsel was appointed and was granted multiple extensions of time in which to file an amended PCRA petition. Appellant eventually filed his Amended Petition for Post Conviction Collateral Relief on August 30, 2019. Therein, Appellant asserted trial counsel had been ineffective for, *inter alia*, failing to request a manslaughter jury instruction. The Commonwealth filed its Answer to Amended Petition for Post Conviction Collateral Relief on November 12, 2019.

A PCRA hearing was held on March 13, 2020, at which time only trial counsel, who had been with the Berks County Public Defender's Office for over fourteen years, testified. N.T. 3/13/20, at 4. Appellant was present and assisted by an Official Spanish Court Interpreter. *Id*. at 3.

Relevant to Appellant's argument presented herein, counsel indicated she did not ask the trial court to provide a manslaughter instruction to the jury in light of Appellant's defense theory prior to and throughout trial that he was not present at the time of the murder. *Id*. at 7. Although counsel and Appellant met "[q]uite a few" times prior to trial, Appellant's position that he

had not been present during the murder never changed. *Id*. at 8. Counsel saw no facts which led her to believe a manslaughter instruction was justified. To the contrary, she stated that one of the initial points a trial court makes when providing that instruction is that "the defendant killed someone." *Id*. at 8-9. For this reason, a manslaughter instruction would not have supported the theory of defense that had been put forth at trial. *Id*. at 10.

Counsel admitted that during her closing argument she had focused on the Commonwealth's failure to prove malice and not specifically on Appellant's absence at the scene of the murder. *Id*. at 13-14, 17. However, counsel explained that while there had been evidence presented at trial that an argument occurred between the assailant and the victim, she did not believe a verbal argument could invoke a sudden and intense passion on the part of an assailant that would justify a manslaughter jury instruction. *Id*. at 16.[2]

On redirect examination, counsel agreed that Appellant at no time authorized her "to "basically admit" that he had been present during the murder. *Id*. at 17. She agreed that were she to have argued the evidence supported a voluntary manslaughter instruction, she would have been making an admission that Appellant was at the scene of the murder. *Id*. Neither

_____

[2] "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection." *Commonwealth v. Montalvo*, 986 A.2d 84, 100 (Pa. 2009) (citation omitted).

Appellant nor any other witness testified at the PCRA hearing to contradict trial counsel's assertions pertaining to Appellant's wishes during trial.

Following the PCRA hearing, the parties submitted briefs in support of their respective positions. Upon consideration thereof along with the testimony presented at the PCRA hearing, the PCRA court denied Appellant's Amended PCRA Petition on June 16, 2020, and Appellant filed a timely notice of appeal on July 14, 2020. Appellant filed his concise statement of matters complained of on appeal on July 24, 2020, and the PCRA court filed its Rule 1925(a) Opinion on September 15, 2020.

In his brief, Appellant presents the following Statement of the Questions Involved:

> I.     Did the trial court err in denying PCRA relief given that defense counsel at trial failed to request a manslaughter jury instruction in a murder case and failed to put forth any defense of manslaughter when there was testimonial evidence at trial that the victim and Appellant had both been arguing and physically fighting immediately prior to the stabbing death of the victim, thus indicating hear of passion on the part of Appellant *See Commonwealth v. Diventura*, 411 A.2d 815 (Pa.Super. 1979)?
>
> II.    Did the trial court err in denying PCRA relief given that defense counsel at trial failed to request a manslaughter jury instruction in a murder case when there was no evidence to suggest any premeditated motive for Appellant to have killed the victim?
>
> III.   Did the trial court err in denying PCRA relief given that defense counsel at trial failed to request a manslaughter jury instruction in a murder case despite the fact that defense counsel's testimony at the PCRA evidentiary hearing about her trial strategy did not correspond to the content of her closing argument that she actually delivered to the jury?

Brief for Appellant at 4 (unnecessary capitalization omitted).

A petitioner raising claims of trial counsel's ineffectiveness must overcome the presumption that counsel is effective by demonstrating the following:

1. the legal claim underlying the ineffectiveness claim has arguable merit

2. counsel's action or inaction lacked any reasonable basis designed to effectuate petitioner's interest;

3. counsel's action or inaction resulted in prejudice to petitioner.

***Commonwealth v. Becker***, 192 A.3d 106, 112-13 (Pa.Super. 2018). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." ***Commonwealth v. Daniels***, 963 A.2d 409, 419 (Pa. 2009).

Initially, we could find Appellant's issues waived for his failure to specify both in his Amended Petition for Post Conviction Collateral Relief and in his Concise Statement of Errors Complained of on Appeal whether which he maintains counsel should have requested a voluntary manslaughter instruction, an involuntary manslaughter instruction, or both. This confusion is compounded by the fact that in his concise statement and appellate brief, Appellant relies upon ***Commonwealth v. Diventura***, 411 A.2d 815 (Pa.Super. 1979), which concerned trial counsel's failure to request an involuntary manslaughter charge; yet, he argues there was "ample evidence of anger and heat of passion and was enough for trial counsel to have made

a request for a heat of passion or a manslaughter defense as a jury instruction and counsel was ineffective for not doing so. **See Commonwealth v. DiVentura**, 411 A.2d 815 (Pa.Super. 1979)." Brief for Appellant at 18.

"An appellant's concise statement must properly specify the error to be addressed on appeal." **Commonwealth v. Jackson**, 215 A.3d 972, 978 (Pa.Super. 2019). "In other words, the Rule 1925(b) statement must be specific enough for the trial court to identify and address the issue an appellant wishes to raise on appeal." **Id**. A concise statement which is too vague to allow the court to identify the issues an appellant raises on appeal is the functional equivalent of no concise statement at all, and its review and legal analysis can be fatally impaired when the court has to guess at the issues raised. "Thus, if a concise statement is too vague, the court may find waiver." **Id.** (citations omitted).

Herein, while trial counsel testified generally at the PCRA hearing regarding a "manslaughter instruction," PCRA counsel did question her specifically about the charge of voluntary manslaughter. N.T., 3/23/20 at 15-16. In addition, the PCRA court distinguished **DiVentura** from the case at bar and rejected the applicability of a voluntary manslaughter jury charge under the evidence presented in its Rule 1925(a) Opinion. **See** PCRA Court Opinion, filed 9/15/20, at 9-11. Thus, to the extent Appellant has preserved his claims as to trial counsel's failure to request a voluntary manslaughter jury

instruction, we next consider their merits. As Appellant's first two issues are related, we will discuss them together.

Pursuant to 18 Pa.C.S.A. § 2503, a person commits voluntary manslaughter if he kills another while, *inter alia*, "acting under a sudden and intense passion resulting from serious provocation by" the victim. 18 Pa.C.S. § 2503(a)(1). The Pennsylvania Supreme Court has determined a jury instruction for voluntary manslaughter with respect to a "heat of passion" is appropriate where the evidence suggests "that, at the time of the killing, [a]ppellant acted under a sudden and intense passion resulting from serious provocation by the victim." **Commonwealth v. Sanchez**, 82 A.3d 943, 979 (Pa. 2013) (quoting **Commonwealth v. Montalvo**, 986 A.2d 84, 100 (Pa. 2009)) (alteration in original). "If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder." **Id.** at 980 (quoting **Commonwealth v. Hutchinson**, 25 A.3d 277, 315 (Pa. 2011)).

As the PCRA court stressed, a reading of the aforementioned elements of voluntary manslaughter necessitates an individual's acknowledgement that he or she killed another person. The PCRA court found that "[t]his fact is of extreme importance in the instant matter where [t]rial [c]ounsel is accused of ineffective assistance for failing to request a jury instruction that would have essentially conceded that her client was (1) present at the scene, and (2)

actually killed the victim." PCRA Court Opinion, filed 9/15/20, at 6. The PCRA court explained it had found trial counsel's unrebutted testimony at the PCRA hearing to be "highly credible" and her strategy to be "reasonable, simple, and straightforward; namely, that her client was not involved in any way with the murder of the victim." *Id*. at 7-8. The PCRA court went on to state:

> Had Attorney Billman attempted to procure the alternate theory of manslaughter, she would have placed herself in the position of admitting that her client was present, had committed the murder, and that heat of passion excused it to some extent. As stated above, throughout her representation, [Appellant] never gave her permission to admit that he had committed the act of killing the deceased. (PCRA Hearing, 3/13/20 at p.7, 8,10, 12). Considering that [Appellant] did not testify and/or refute [t]rial [c]ounsel's statements regarding his own defense strategy, this [c]ourt finds that it is disingenuous to now argue that [t]rial [c]ounsel was ineffective for abiding by his prior wishes at the time of trial.
>
> Moreover, a thorough reading of the trial transcript shows that there is no evidence that points to a provocation on behalf of the deceased victim, and that such provocation was directed toward [Appellant]. If anything, the evidence in the case points to the fact [Appellant] was the initial aggressor who broke into the residence and then committed the murder out of jealousy. (N.T. March 16, 2015 at 39-41, 53, 55-59, 80-82, 88-89, 114,117,123-129). The mere assertion by PCRA [c]ounsel that the victim and [Appellant] were "arguing and fighting immediately prior to the stabbing death of the victim" [3] does not-by any means-prove that the deceased victim caused an intense provocation that [Appellant] had to overcome. Absent such evidence, [Appellant] is incapable of establishing the lack of any type of "cooling off" period that is required in order to establish a basis for voluntary manslaughter Busanet, supra, Sanchez, supra. [Appellant's] claim must therefore fail.

> ***

> Contrary to the situation in DiVentura, [Appellant] in the instant case did not take the stand in his own defense and did not assert any facts that would lead this Court to the conclusion that a manslaughter charge would be appropriate. To the contrary,

[Appellant's] trial counsel-Attomey Billman-made it very clear at the PCRA hearing that it was her client's position the entire time that he did not engage in any activity that would suggest that he fought with the victim, let alone killed the victim. (PCRA Hearing, 3/13/20 at p.7, 8, 10, 12). As such, our case is factually distinguishable from the case cited by [Appellant].

Moreover, the Superior Court in DiVentura makes it clear that DiVentura's trial counsel did not assert any trial strategy "as the reason for counsel's decision not to request the instruction." DiVentura, supra. In the instant case, Attorney Billman made her trial strategy abundantly clear to this [c]ourt; namely, her client stated that he wasn't present and therefore did not commit the act. Attomey Billman specifically stated that a request for a manslaughter instruction would run counter to her client's position as the definition of Manslaughter starts with the presumption that her client did, in fact, commit a murder, albeit under a "heat of passion" scenario. Unlike the situation in DiVentura, Attorney Billman relied on the present state of the law, and her reasonable trial strategy, as her basis for not requesting the manslaughter instruction. From this, we find no ineffectiveness against Trial Counsel and PCRA counsel's reliance on DiVentura is factually and legally misplaced.

____

[3] See [Appellant's] Concise Statement of Errors Complained of on Appeal, page 1.

*Id*. at 8-9, 10-11.

The law is settled that trial counsel will not be deemed ineffective for failing to request a jury instruction on voluntary manslaughter where such a charge is contrary to the defense theory of the case. **See Commonwealth v. Ort**, 581 A.2d 230 (Pa.Super. 1990) (holding trial counsel not ineffective for failing to request voluntary manslaughter instruction in murder trial where person killed in an arson-connected fire and where defense was defendant did not set fire); ***Commonwealth v. Anderson***, 501 Pa. 275, 461 A.2d 208

(1983)(finding voluntary manslaughter charge inconsistent with "innocent bystander" defense).

In the matter *sub judice*, the record reveals counsel's strategy was to pursue Appellant's theory that he did not commit the murder, and this strategy is clearly inconsistent with a charge of voluntary manslaughter. Indeed, because Appellant insisted that he was not at the scene of the murder, counsel was prevented from requesting a jury instruction for manslaughter, which would have required some concession of Appellant's culpability for the murder. ***See McCoy v. Louisiana***, ____ U.S. ____, 138 S. Ct. 1500, 1505, 200 L. Ed. 2d 821 (2018) (holding a defendant has the constitutional right to adamantly object to any admission of guilt and to insist that counsel refrain from admitting his or her guilt, even when counsel's experienced-based view is that conceding guilt offers the defendant the best chance to avoid a greater penalty).

Furthermore, we note that the jury was charged on first-degree, second degree, and third-degree murder, and returned a verdict of guilty on all offenses. ***See*** N.T., 3/18/15, at 302. Accordingly, even if trial counsel erred in failing to request a manslaughter charge, Appellant suffered no prejudice. ***See Commonwealth v. Haynes***, 577 A.2d 564, 574 (Pa.Super. 1990 (concluding appellant suffered no prejudice from trial court's denial of voluntary manslaughter charge where jury was charged on first, second and third-degree murder and found appellant guilty of first degree murder; "jury

could have exercised its mercy dispensing power and brought in a verdict of third or second degree murder[,] but it found appellant guilty of first-degree murder.").

Therefore, as the PCRA court concluded, Appellant was not entitled to a jury instruction on voluntary manslaughter, and trial counsel was not ineffective for failing to request that instruction. **See Becker**, **supra**. Accordingly, Appellant is entitled to no relief on his first two claims.

In his final issue, Appellant alleges trial counsel's testimony at the PCRA hearing was in direct conflict with statements she made during closing argument to the jury at trial. Specifically, Appellant reasons that because counsel focused a portion of her closing argument on disproving an element of first degree murder, malice, she also should have argued in favor of manslaughter as that would have been consistent with the trial testimony and achieved her apparent goal of obtaining a verdict of something less than first degree murder. In finding no merit to this contention, the PCRA court stated:

> This [c]ourt finds PCRA [c]ounsel's unrebutted testimony highly credible in that she did not believe that the testimony produced at trial established a basis for a Manslaughter defense. Without such evidence, Attorney Billman had no factual basis, or legal obligation, to request such a charge. **See Commonwealth v. Williams**, 640 A.2d 1251(1994). Moreover, this [c]ourt does not agree that [t]rial [c]ounsel's argument to the jury that malice was not proven by the Commonwealth is somehow akin to arguing that the elements of Manslaughter were present. To the contrary, it is clear to this [c]ourt that [t]rial [c]ounsel was merely arguing that the Commonwealth had failed to establish [Appellant's] guilt of First Degree Murder beyond a reasonable doubt. We do not read anything further in her closing statement to the jury, nor do we find her closing argument in any way inconsistent with her

- 14 -

testimony before this [c]ourt at the PCRA Hearing on March 13, 2020. For these reasons, we find Petitioner's final claim to be without merit.

Trial Court Opinion, filed 9/15/20, at 13.

Appellant's entire argument on this claim of ineffectiveness of counsel centers around his interpretation of certain statements trial counsel uttered during her closing argument as being contradicted by her PCRA testimony. However, his view that the closing argument focused upon the element of malice is belied by a reading of it in its entirety, wherein she develops a metaphor of the case as a puzzle in which the Commonwealth's evidence had left numerous missing pieces. *See* N.T. Trial, 3/18/15, at 271-277. Counsel's references to malice were made in the larger context of her emphasis upon the shortcomings and inconsistencies in the Commonwealth's witness' testimony as "flawed Individuals," *id*. at 272, not as an admission that the elements of manslaughter had been satisfied.

Moreover, regardless of the allegations counsel made in her closing argument, the trial court properly instructed the jury at the outset of trial as follows:

> First and foremost remember that you alone are the judges of the facts. And you're going to hear that in my last charge to you at the end of the case, several times; that is, you must determine what the facts are based solely on the evidence that will be presented to you here in court. **What attorneys say is not evidence**. It's only what you will hear from the witnesses

who appeal and who will testify that constitutes evidence, as well as any exhibits that are admitted. . . .(emphasis added).[3]

N.T. Trial, 3/16/15, at 11.

"It is well settled that the jury is presumed to follow the trial court's instructions, and Appellant does not otherwise attempt to offer any evidence establishing that the jury failed to do so in the instant case." ***Commonwealth v. Cash***, 635 Pa. 451, 484, 137 A.3d 1262, 1280 (2016) (citation omitted). Similarly, the jury herein was well aware that neither defense counsel's nor the Commonwealth's closing argument was evidence or could usurp its role as the sole finder of facts from the evidence presented at trial and the sole judge of a witness's credibility. Accordingly, Appellant has failed to prove by a preponderance of the evidence that trial counsel provided ineffective assistance due to statements made during closing argument. As a result, his final claim must fail.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/29/2021

---

[3] The trial court's closing instructions were given but not transcribed. ***See*** N.T.3/18/15, at 295 (indicating only "(Charge of the Court)".